**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TIMOTHY BOLAR, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 1:17-0360-JB-B** |
| | ) | **(Consolidated)** |
| **SOUTHERN INTERMODAL XPRESS,** | ) | |
| **LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANT SOUTHERN INTERMODAL XPRESS, LLC'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF

Defendant Southern Intermodal Xpress, LLC (hereinafter, "SIX") moves for summary judgment pursuant to Rule 56 of the *Federal Rules of Civil Procedure* on Plaintiffs Cleotho Mosley, Oscar Gibson and Corwin Scott's claims for overtime wages under the Fair Labor Standards Act ("FLSA"). SIX properly classified Plaintiffs as exempt employees pursuant to the Motor Carrier Act exemption, and SIX is due summary judgment.

## INTRODUCTION

Plaintiffs seek to recover alleged unpaid overtime under the FLSA. Plaintiffs' claims fail as a matter of law based on the undisputed facts which show that they were exempt from overtime under the Motor Carrier exemption ("MCE") to the FLSA. There is no dispute that SIX is a motor carrier subject to the U.S. Department of Transportation's ("DOT") jurisdiction and that Plaintiffs were drivers who in the ordinary course of their work transported goods on public roads in interstate commerce. Even if Plaintiffs had not transported goods on public roads in interstate commerce, which they admit that they did, the undisputed facts show that all SIX drivers including Plaintiffs could have been reasonably expected to be assigned work involving interstate travel or

intrastate work in the continuous flow of interstate commerce every four months of their employment.

## STATEMENT OF UNDISPUTED FACTS

**I.**    **Southern Intermodal Xpress is a licensed federal motor private carrier subject to the jurisdiction of the DOT.**

SIX is a federal motor private carrier licensed by the DOT with offices in Mobile, Alabama and New Orleans, Louisiana. (Ex. A (Eric Cooper Declaration) ¶ 3; Ex. B (Cleotho Mosley Deposition) 82:15-22).[1] SIX registers with the Federal Motor Carrier Safety Administration ("FMCSA"), a unit of the DOT because the federal government classifies SIX as an interstate carrier operating vehicles over 10,000 pounds.  (Ex. A ¶ 3).  The DOT has assigned SIX the DOT identification number of 1605061.  (*Id.* ¶ 3).

SIX's primary business is the transport of intermodal cargo containers loaded with products to and from the Ports of Mobile and New Orleans.  (Ex. A ¶ 5).  The vast majority of SIX's one hundred and forty (140) drivers transport import ocean freight containers from the Port (primarily the Port of Mobile's Container Terminal) to their final destinations in Alabama and surrounding states or deliver export ocean freight containers to the Port bound for both out-of-state and foreign destinations. (Ex. A, ¶ 5; Ex. C (Eric Cooper Deposition) 10:3-11:14, 95:19-22; Ex. D (Shelly Asmus Deposition) 62:14-63:6); Ex. E Interrogatory Response No. 3). About ninety-five (95%) of SIX's business is the transport of export intermodal cargo on public roads (the first leg of a container's transport in interstate/foreign commerce) or the transport of import intermodal cargo on public roads (the last leg of a container's transport in interstate/foreign commerce). (Ex. C 10:19-11:1; Ex. A ¶ 5).

---

[1]  Exhibits are filed in a separate, contemporaneously-filed Evidentiary Submission.

About fifteen (15) SIX drivers provide driving services at the Kimberly Clark ("KC") paper mill located at 200 Bay Bridge Road. SIX has provided these services pursuant to a contract with KC entered into around April 2015. (Ex. A ¶ 6; Ex. C 11:18-20).[2] Those services include spotting services at KC's facilities as well as delivering fiber material and finished paper products manufactured at the mill to the KC Distribution Center ("DC") and to local warehouses, primarily Merchants Transfer Company ("Merchants"). (Ex. A ¶ 6). At the DC and Merchants, the finished paper products transported by SIX drivers are placed on over-the-road trucks and travel to their final out-of-state destinations. (*Id*. ¶ 6). In addition, the fiber transported by SIX drivers which KC uses to make its products is imported from outside of the state and foreign countries. (*Id*. ¶ 6). SIX receives compensation for the transport of the intermodal cargo it handles as well as for the transport of KC's products bound for out-of-state destinations and the transport of the inbound fiber material. (*Id*. ¶ 4).

All SIX drivers are hired in accordance with DOT standards and are required to have and maintain a Class A CDL as a condition of employment. (Ex. B 85:4-20; Ex. C 15:10-16:3, 22:6-12; Ex. D 63:14-18).[3] SIX requires all of its drivers to be qualified, meaning they have a CDL, have passed background checks, drug testing, medical examination, all under the rules established by DOT. (Ex. A ¶ 11). SIX requires all drivers to adhere to DOT regulations, and all vehicles used by SIX drivers undergo an annual DOT inspection. (*Id*. ¶ 8). SIX drivers receive training regarding the safe operation of vehicles on public roads and are also required to do pre- and post-trip

---

[2]  Prior to the KC/SIX contract, KC contracted with Lazer Spot, Inc. to provide these driver services, which were substantially the same as those provided by SIX. (Ex. K ¶ 6).

[3]  If a driver's CDL is suspended, SIX does not allow the driver to drive; if a driver loses his CDL, SIX terminates the driver's employment. (Ex. A ¶ 12). For example, Soloman Curry, a former plaintiff in this lawsuit, was suspended from driving and working at KC in March 2017 when his CDL was suspended. (Ex. A ¶ 12, Ex. 5 (SIX 3006-7)). When Curry's CDL was suspended again in February 2018 and he was not able to get it reinstated, he was terminated. (*Id*. (SIX 3010, 3016)).

inspections on its vehicles. (Ex. C 46:1-3; Ex. F (SIX 1897); Ex. G (Oscar Gibson Deposition) 24:11-26:4, 32:14-17; Ex. H (Corwin Scott Deposition) 103:16-104:1).

SIX hires all of its drivers in the same manner, regardless of whether they are assigned to work in Mobile or New Orleans and regardless of whether they are assigned intermodal or KC work. (Ex. A ¶ 11; Ex. C 15:10-16:3). SIX's driver job description states that the duties of the position require "transport[ing] and deliver[ing] freight" as well as "interchange[ing] equipment for loading and unloading at various locations…" (*Id.* 25:4-7; Ex. A ¶ 10, Ex. 3). When advertising for new drivers, SIX does not distinguish between intermodal or KC drivers and advertises for Class A Drivers. (Ex. A ¶ 11, Ex. 4). While some drivers are ultimately assigned to primarily work at KC and some are assigned primarily to be an intermodal driver, SIX commonly moves drivers between intermodal freight work and work at KC. (Ex. C 18:3-11, 19:20-21:7; Ex. D 63:2-13; Ex. I (Byron Nettles Deposition) 82:20-83:12).  All SIX drivers assigned to KC are subject to being called to drive on public roads and transport KC's finished products. (Ex. A ¶ 7).

## II.   SIX drivers at KC transported goods on public roads in the continuous stream of interstate commerce.

KC makes and distributes paper products, including finished toilet paper, folded paper towels, rolled paper towels, as well as large rolls of paper which it sells directly to customers.  (Ex. J (Dennis Helms Deposition) 34:4-17, 41:7-16).[4] The KC mill is operational 24 hours a day, and SIX drivers are at KC's facilities 24 hours a day, 365 days per year. (Ex. D 26:2-10; Ex. H 111:19-20; Ex. I 29:21-30:16; Ex. J 16:22-17:10; Ex. K (Dennis Helms Affidavit) ¶ 4).

---

[4]  Convermat, a paper distributor, is one of KC's customers for the large rolls of paper.  (Ex. L (Lisa Story Deposition) 11:15-12:19; Ex. J 69:4-12).

SIX drivers assigned to KC: (1) move/spot trailers at the mill and the DC ("spotting");[5] (2) transport KC's finished tissue paper from the mill to the DC ("transport of tissue paper"); (3) transport finished large paper rolls to Merchants ("Convermat rolls"); and (4) transport loads of fiber (raw material) to and from Merchants and to and from the mill and the DC ("fiber shuttles"). (Ex. C 19:7-17, 52:12-53:8; Ex. I 10:9-16, 22:17-21; Ex. J 12:2-16:1; Ex. K ¶¶ 6-7). With the exception of spotting trailers, all of the trips taken by SIX drivers are on public roads around the mill, the DC, and Merchants.  (Ex. A ¶ 6; Ex. K ¶¶ 5, 7-8, 11).

KC contractually requires that every SIX driver have "appropriate licenses to travel over road (CDL)" and requires that all SIX drivers be able to do all of the driving functions under the contract. (Ex. C 25:4-31:22, 44:16-45:4; Ex. I 68:2-13; Ex. J 70:19-21, 73:5-11; Ex. K ¶ 12; Ex. AA (KC-SIX Contract – filed under seal), (SIX 3347).  The contract provides: "[a]ll drivers on site are to be trained and capable of delivering service to any dock area of the mill and/or DC. Drivers will be expected to work together and flow-to-work requests, [and] not be exclusively assigned to any one particular area of the mill."  (Ex. AA (SIX 3346)).  KC also requires that SIX adhere to DOT regulations and that all vehicles used be licensed, tagged and able to move on City and State Highways including the roadways around the mill.  (Ex. K ¶ 12).  Over-the-road tractors used in the operation also must meet all DOT requirements including annual DOT inspections, and they must have a DOT inspection sticker. (*Id.*).

SIX drivers are trained to do every job at the KC sites and local warehouses, and they are aware they may be required to do any of the driving services required by the KC contract. (Ex. D

---

[5]  Spotting is moving loaded and empty trailers between various doors or parts of the mill or the DC.  (Ex. A ¶ 6; Ex. B 94:17-95:21). During Plaintiffs' employment, SIX provided spotting services at both the mill and the DC. Currently, SIX only provides spotting services at the KC mill and hauls finished products to the DC and Merchants.  (*Id.*).

60:9-22; Ex. I 68:14-69:19; Ex. J 71:3-10; Ex. K ¶ 13). Upon hiring, SIX drivers are required to

do a road test both on KC facilities and off the facilities on public roads to demonstrate techniques

such as backing up, shifting, and attentive driving. (Ex. C 24:14-25:3; Ex. I 45:17-46:9).

SIX drivers use day cabs or "spotter" trucks for their work. (Ex. A ¶ 8; Ex. D 18:11-20:19).

Spotters have a single axle and are typically used to spot trailers in and out of the doors in the mill

and the DC. (Ex. A ¶ 8). Day cabs have three axles and are typically used to transport Convermat

rolls to Merchants. (*Id*. ¶ 8).[6]  All of the day cabs and spotters operated by SIX drivers are DOT

registered and tagged, as required by the contract, and weigh over 10,000 pounds. (Ex. A ¶ 8; Ex.

D 20:16-19; Ex. I 23:17-24:2, 84:15-20; Ex. J 58:4-7, 70:22-71:2; Ex. K ¶ 12). In addition, SIX

only uses "on road" clear, diesel fuel, which is DOT compliant for use on public highways and

roads.  (Ex. A ¶ 8).

SIX drivers are supervised and receive their shift assignments from Shelly Asmus, the Site

Supervisor, Byron Nettles, the Assistant Site Supervisor, or sometimes the lead driver.  (Ex. D

57:5-19; Ex. I 97:19-99:6).  For each shift, drivers are given a general assignment to the mill, the

DC, or to haul fiber and/or Convermat loads.  (*Id*.; Ex. C 50:15-19).  However, drivers can be

moved during the shift to perform a different function at a different location when KC's workload

requires it or if a truck breaks down, etc.; the SIX/KC contract mandates that flexibility. (Ex. C

44:5-45:4; Ex. D 60:12-61:5; Ex. H 73:3-12, 111:21-112:6; Ex. AA (SIX 3346)).

Drivers work 12-hour shifts, either the day shift from 5:30 a.m. to 5:30 p.m., or the night

shift from 5:30 p.m. until 5:30 a.m.[7] (Ex. C 45:11-16, 99:9-10; Ex. D 13:5-12, 31:22-32:2). Drivers

---

[6]  SIX's day cabs have a Global Positioning System (Fleet-Tracking) installed that provides real-time tracking and location of the truck. (Ex. A ¶ 9). SIX's fleet-tracking provider can prepare reports but SIX has access to these reports for only a limited period of time. SIX was able to obtain certain reports related to Plaintiffs. (*Id*., Ex. 2).
[7]  SIX drivers clock in and out at the KC mill each day. (Ex. B 88:10-17; Ex. G 40-41).

are typically assigned to a day shift or a night shift but may work both shifts during their employment. (Ex. B 90:12-20; Ex. C 43:2-12; Ex. G 41:8-21). Drivers have a base schedule which rotates between 48 hours one week and 36 hours the next. (Ex. C 99:9-100:5; Ex. I 63:19-64:8). There are also additional shifts assigned by the site managers based on KC's demand to cover the Convermat rolls and fiber shuttles. (Ex. I 64:9-65:8). The Convermat and fiber shifts are scheduled a minimum of 15 days each month. (Ex. J 69:22-70:10).

SIX drivers maintain what are called "move sheets" or "load sheets" which document the trailers they have moved and where they have moved them.  (Ex. B 101:5-102:19; Ex. C 63:22-67:16; Ex. D 34:2-17; Ex. G 72:18-73:10, 74:6-76:17; Ex. H 117:19-118:5; Ex. I 39:1-7, 40:15-18, 71:48). The driver writes the truck number he is operating, the trailer number he moved, whether the trailer was loaded or unloaded, where he picked up the trailer and where he dropped off the trailer. (Ex. B 101:5-102-:19; Ex. G 72:18-75:14). Nettles reviews the load sheets each day and tallies the number and types of moves per day onto a master sheet; the data is broken down by day and night shifts and has been kept since SIX was awarded the KC contract. (Ex. I 15:1-16:5, 71:12-72:4, 80:16-82:19; Ex. M (Nettles Declaration) ¶ 3, Ex. 1).[8] Nettles also does yard checks each morning to ensure that the trailers have been moved in accordance with the load sheets. (Ex. I 72:5-17; Ex. M ¶ 5).  The master sheet demonstrates that SIX drivers are frequently transporting loads to the DC and to Merchants during both shifts. (Ex. M ¶ 3, Ex. 1).

---

[8]  Before September 2016, SIX disposed of the driver load sheets after Nettles reviewed them and entered the data on the master sheet. (Ex. M ¶ 4).  However, after Will Greene and David Foster filed a lawsuit identical to this one (*David Foster et al. v. Southern Intermodal Xpress, LLC, et al.*, Case No.: 1:16-CV-00629), SIX started retaining the load sheets. (Ex. A ¶ 10). The duties of the SIX drivers at KC have not changed so load sheets prior to September 2016 would be substantially the same as the load sheets after 2016. (Ex. M ¶ 4).

A.      **Tissue paper loads from the mill to the DC.**

SIX drivers regularly transport finished and packaged tissue paper from the mill (primarily from the West Dock) to the DC.  (Ex. I 84:21-85:1; Ex. K ¶ 8). KC's products are held at the DC for a brief period of time before being transported in over-the-road trucks to various destinations throughout the country, including but not limited to Georgia, Texas, Florida, Ohio, and Illinois. (Ex. H 41:20-42:6; Ex. K ¶¶ 3, 10).  In fact, most Scott tissue paper found in stores in the southern part of the United States, the Southeast, the Midwest, and portions of the Rust Belt came from the Mobile mill. (Ex. J 64:16-65:1).

This tissue paper is an individually wrapped product that is placed on a pallet and is ready to be transported to KC's out-of-state customers when it leaves the mill.  (Ex. B 120:3-18, Def. Ex. 7; Ex. G 48:12-49:4; Ex. H 123:18-124:3; Ex. J 62:3-23, 63:1-64:3, 68:2-5; Ex. K ¶ 10). There is no processing, modification or alteration to the tissue paper at the DC.  (Ex. J 68:2-5). Once the tissue paper arrives at the DC, it is loaded onto an over-the-road truck and continues its journey towards its out-of-state and final destination. (Ex. J 62:13-63:4, 68:17-22). The tissue often is picked up and transported out-of-state on the same day SIX drivers transport it to the DC. (Ex. K ¶ 10).[9] KC arranges for and pays for that last leg of transport of the tissue paper to the out-of-state destination. (Ex. J 68:23-69:3). KC produces and transports this finished product to the DC in response to customer orders and based on historical customer demand data. (Ex. J 66:16; Ex. K ¶ 8). KC intends and expects that once the tissue paper leaves the mill, the product will continue its interstate journey to its out-of-state customers. (Ex. K ¶ 10). The first leg of that transport is

_____

[9]   The tissue paper typically is only housed for eight to ten hours before it leaves for its final destination out-of-state.  (Ex. N (Dan McDaniel Deposition) 79:13-24).

performed by SIX drivers taking the finished product from the mill to the DC. (Ex. J 25:12-17; Ex. K ¶ 10).

KC requires SIX drivers to transport tissue paper to the DC 24 hours a day, seven days a week, and the number of loads varies depending on whether all three KC palletizers are running. (Ex. K ¶ 9). If all three palletizers are running, SIX drivers make approximately 21 trips to the DC each day. (*Id*.)

The KC mill is separated from the DC by Bay Bridge Road which is a public road. (Ex. B 126:17-127:19; Ex. G 49:23-50:5; Ex. H 42:14-44:2, Ex. 5; Ex. K ¶ 5). Perpendicular to Bay Bridge Road is Herbert Street which is also a public road. (Ex. K ¶ 5).


Excerpt of Ex. 8 to Mosley Deposition (Ex. B 122:4-126:1, SIX Ex. 8).

SIX drivers pick up the tissue paper from the mill (primarily from the West Dock), exit the main gate and drive over Bay Bridge Road (green arrow), proceed down Herbert Street (yellow arrow) to the ungated guard station (circled in red), and enter the DC. (Ex. B 94:3-96:18, 105:11-106:6, 126:5-20; Ex. D 21:9-22:5; Ex. G 46:11-48:5; Ex. H 65:19-68:4; Ex. I 22:22-23:16, 85:2-22; Ex. J 65:2-66:2; Ex. K ¶ 8).



(Ex. B, SIX Ex. 9 –Herbert Street at the intersection of Bay Bridge Road, facing the mill and showing the main gate, a stop sign, and a flashing signal.)

Herbert Street and Bay Bridge Road are paved roads that are open to the public and passable by four-wheel standard passenger cars as well as trucks. (Ex. C 31:23-32:13; Ex. H 70:2-71:18; Ex. I 87:11-15; Ex. J 26:13-27:3, 65:15-67:8, Pltf. Ex. A; Ex. N 36:1-37:15; Ex. O (Smotherman Declaration) ¶ 5).

While there is a guard shack and a stop sign at the entrance of the DC (see red circle in Ex. 8 to Mosley Deposition), there are no gates or barriers on Herbert Street from the Bay Bridge Road intersection to the DC entrance. (Ex. B 48:15-20, 126:17-127:19; Ex. G 47:8-48:2; Ex. H 68:1-4, 69:19-70:1; Ex. I 85:17-87:15; Ex. J 66:10-13, 72:9-13, Def. Ex. 1; Ex. O ¶ 5). Security personnel at the guard shack do not restrict general public access to the DC.  (Ex. O ¶ 6). Likewise, there are no prohibitive signs that restrict public access to Herbert Street.  (Ex. G 49:5-7; Ex. O ¶ 5). Businesses other than KC have been located at the DC facility beyond the guard shack, and their employees and visitors travel on Herbert Street. (Ex. J 67:9-68:1; Ex. O ¶ 6). Herbert Street is traveled by family members of employees, taxis, Lyft drivers, food delivery drivers, public utility vehicles, and railroad maintenance vehicles. (Ex O ¶ 6).  In addition to being open to vehicular traffic, Herbert Street has a sidewalk that runs along the B lot which is open to pedestrian travel.

(Ex. B 127:12-20; Ex. J 66:14-67:3; Ex. O ¶¶ 6, 8).[10]  The City of Mobile maintains Herbert Street including a flashing signal at the intersection of Herbert Street and Bay Bridge Road and the City has consistently performed maintenance and repairs on Herbert Street. (Ex. P (City of Mobile Documents)). Furthermore, KC's security firm contacts the local police if an accident occurs outside the gate, such as on Herbert Street, but not if an accident happens within the gates of KC. (Ex. J 38:11-21, 39:10-40:12; Ex. O ¶ 9).

### B. Convermat loads to Merchants.

In addition to transporting tissue paper to the DC, SIX drivers transport rolls of "wadding paper" product, often called "Convermat" rolls, to Merchants at least 15 days per month, during both the day and night shifts. (Ex. C 51:15-52:3; Ex. D 55:17-56:18; Ex. I 30:17-22, 50:5-19; Ex. J 69:4-70:10; Ex. K ¶ 11). Merchants is a warehouse that stores and ships products such as paper, chemicals, wood and metal. (Ex. J 46:6-12; Ex. L (Lisa Story Deposition) 7:16-21). Convermat, a paper distributor, purchases the paper rolls from KC, and Merchants stores the rolled paper product for a brief period of time until an over-the-road truck takes them to Convermat customers around the country. (Ex. L 11:15-12:19).

Merchants is located at 1200 Paper Mill Road, approximately one mile from KC. (Ex. L 7:22-23, 54:11-12). SIX drivers transport the finished product from the mill to Merchants by picking up the load at the North Dock or the K-Cop yard, exiting the mill contractor's gate out to Paper Mill Road, a public road, and driving down Paper Mill Road to Merchants. (Ex. B 104:11-105:10; Ex. D 26:23-27:2, 30:8-20; Ex. G 49:23-50:5; Ex. H 82:16-83:5; Ex. I 30:23-32:2, 74:16-75:9, 87:16-88:5; Ex. L 14:3-5; 34:8-23, 47:22-48:7).

---

[10]  There are two parking lots along and accessed by Herbert street, the B Lot and C Lot. (Ex. B, SIX Ex. 8; Ex. I 26:7-23). During the entire time relevant to Plaintiffs' complaint, the C Lot was open for parking, for the public and other contractors. (*Id.*; Ex. G 50:22-51:12; Ex. O ¶ 8).



(Ex. G 70:12-72:14, SIX Def. Ex. 9 (Excerpt) – Route from the KC Mill to Merchants)

While the SIX/KC contract requires that SIX drivers make this haul a minimum of 15 days each month, KC's production sometimes requires that SIX drivers transport this product more often than that. (Ex. J 69:22-70:6; Ex. AA (SIX 3347)). SIX typically expects KC to run Convermat every week but does not know the exact days until SIX receives notice from KC within 12 to 24 hours of production.  (Ex. C 53:9-22; Ex. I 64:9-22).  SIX sometimes asks for drivers to volunteer for these shifts, and sometimes SIX assigns drivers to the shift and/or moves someone from another area to work the shift. (Ex. C 53:23-54:14, 127:18-128:18, 129:4-130:5). Any of the drivers assigned to KC may be called upon to transport Convermat rolls to Merchants. (Ex. A ¶ 7; Ex. C 53:23-54:15; Ex. D 55:22-57:9). SIX uses its own trailers, the "Red Bar 99" series, to move Convermat rolls to Merchants, although they sometimes use other available trailers if more are needed. (Ex. B 102:20-103:15; Ex. G 76:21-77:14; Ex. I 74:11-19).

Merchants receives loads about two to three days per week, any day during the week. (Ex. L 46:22-47:10, 51:1-5). Merchants regularly accepts loads from 7:00 a.m. until 11:00 p.m., although they will stay open later per KC's request or close earlier if they know not to expect any more loads from KC.  (Ex. C 55:9-56:1; Ex. L 14:6-16, 47:11-21). Normally, the night shift only runs Convermat loads during the first part of the night shift, *i.e.*, 5:30 p.m. to 11:00 p.m. (Ex. C 56:2-6). The drivers typically fill up the available doors at Merchants, but when they are full or

after Merchants closes, drivers place any remaining Convermat loads on the K-Cop lot, a yard lot where trailers are stored. (Ex. C 68:23-69:6; Ex. I 32:22-33:23, 75:22-76:11, 78:11-80:15).

The finished paper rolls are temporarily stored at Merchants an average of 10 days, but the time of storage varies anywhere between hours (in which a load is immediately unloaded and reloaded onto an over-the-road truck) and 30 days. (Ex. L 17:12-23, 35:21-36:9, 41:6-42:8). The paper rolls are finished products, and no further production occurs and no changes are made to the rolls at Merchants. (Ex. K ¶ 11; Ex. L 18:1-7, 33:22-34:7). The paper is staged or grouped in the warehouse according to Convermat's purchase order. (Ex. L 33:19-21).

## III.   Cleotho "Curtis" Mosley drove on public roads transporting goods in the continuous stream of interstate commerce.

When SIX took over the KC contract from Lazer Spot in 2015, Cleotho "Curtis" Mosley applied for a driver position and was hired by SIX and assigned to KC.[11] (Ex. B 8:13-18, 60:1-15, 77:9-13, SIX Ex. 2). Mosley was hired in accordance with all Federal Motor Carrier Safety regulations. (Ex. B, SIX Ex. 2). He was required to have and maintain a CDL to work for SIX. (Ex. B 80:8-14). He had a DOT physical and drug screen and consented to a search of his driving records. (Ex. B 80:15-82:14, SIX Ex. 2). Mosley is aware that SIX is a federal motor carrier, and he signed a Self-Certification Affidavit stating that his commercial transportation is interstate and subject to 49 C.F.R. part 391, *i.e.*, DOT qualification standards. (Ex. B 81:3-82:22, 85:4-20).

Mosley worked on the day and night shifts during his employment. (Ex. B 90:12-18; Ex. I 58:11-16). Mosley's job duties included all of the duties of a KC driver: spotting, transporting fiber shuttles, Convermat loads to Merchants, and tissue loads to the DC. (Ex. B 99:6-10). He became

---

[11]   The relevant time period for this action is August 9, 2015 to August 9, 2017 (the date the complaint was filed) if the two-year statute of limitations applies. The relevant period begins a year earlier, on August 9, 2014, if the Court finds a "willful" violation.

a lead driver the last week of April 2017. (Ex. Q (Asmus Declaration) ¶ 3).  A lead driver works a normal shift as a driver, but he basically serves as a point of contact for the drivers and KC when the site supervisors are not there. (Ex. B 100:6-22; Ex. I 97:19-98:5; Ex. Q ¶ 3). Mosley's employment with SIX was terminated on or about June 23, 2018.  (Ex. B 77:14-23).

### A.    Mosley transported tissue paper to the DC.

It is undisputed that Mosley transported finished tissue paper from the mill to the DC on a regular basis throughout his employment. (Ex. B 94:3-16, 95:22-96:18, 105:18-106:3; Ex. R (Cleotho Mosley Load Sheets)). Mosley recorded his transport of tissue paper to the DC on his load sheets with the notation "West" under the "P/U" column and the notation "D/C" under the "Drop" column. (Ex. B 101:5-102:19, 105:11-106:6; Ex. R). The following chart summarizes Mosley's transport of the tissue paper as shown on his load sheets (Ex. R):[12]

| DATE | # TRIPS | DATE | # TRIPS | DATE | # TRIPS | DATE | # TRIPS |
|---|---|---|---|---|---|---|---|
| 9/6/16 | 1 | 3/1/17 | 1 | 5/14/17 | 1 | 7/9/17 | 2 |
| 9/17/16 | 3 | 3/3/17 | 2 | 6/6/17 | 1 | 7/12/17 | 6 |
| 9/18/16 | 2 | 3/4/17 | 2 | 6/9/17 | 6 | 7/13/17 | 4 |
| 10/2/16 | 1 | 3/5/17 | 2 | 6/10/17 | 8 | 7/17/17 | 1 |
| 10/8/16 | 3 | 3/8/17 | 2 | 6/11/17 | 8 | 7/21/17 | 4 |
| 10/28/16 | 3 | 3/9/17 | 2 | 6/14/17 | 4 | 7/22/17 | 2 |
| 11/20/16 | 4 | 3/17/17 | 1 | 6/19/17 | 7 | 7/23/17 | 1 |
| 12/1/16 | 7 | 3/18/17 | 2 | 6/20/17 | 2 | 7/27/17 | 2 |
| 12/5/16 | 4 | 3/19/17 | 1 | 6/23/17 | 4 | 7/31/17 | 1 |
| 1/9/17 | 1 | 3/22/17 | 1 | 6/24/17 | 5 | 8/1/17 | 2 |
| 2/17/17 | 4 | 3/23/17 | 3 | 6/25/17 | 8 | 8/4/17 | 3 |
| 2/19/17 | 2 | 3/27/17 | 2 | 6/28/17 | 7 | 8/5/17 | 3 |
| 2/22/17 | 3 | 4/19/17 | 6 | 6/29/17 | 6 | 8/6/17 | 5 |
| 2/23/17 | 3 | 4/22/17 | 1 | 7/3/17 | 5 | | |
| 2/27/17 | 8 | 4/25/17 | 1 | 7/4/17 | 3 | | |
| 2/28/17 | 7 | 4/28/17 | 1 | 7/7/17 | 3 | | |

---

[12]   Mosley's transport of tissue paper to the DC is highlighted in purple. (Ex. R).  Mosley's transport of Convermat rolls to Merchants is highlighted in yellow. (*Id.*)

### B.    Mosley transported Convermat rolls to Merchants.

Mosley also transported Convermat to Merchants on a regular basis. (Ex. B 54:16-55:2, 93:17-94:2, 104:4-105:1, 111:5-118:18 (confirming at least one Convermat trip per month between September 2016 - August 2017), 131:19-133:19; Ex. R). Mosley transported Convermat rolls from the K-Cop lot at the mill to Merchants when he was assigned the Convermat/shuttle shift by his supervisor. (Ex. B 90:12-18; see also Ex. R (SIX 2783)). Mosley does not dispute that he transported Convermat loads, and he admits that the load sheets he personally filled out when he was employed show that he transported Convermat on a regular basis. (Ex. B 116:8-118:18).

A Convermat roll is picked up at the North Dock or the K-Cop lot and transported to Merchants primarily in one of SIX's "99 series" trailers. (Ex. B 102:20-103:15, 105:8-10). The following chart summarizes Mosley's entries on his load sheets showing his transport of Convermat rolls to Merchants (Ex. R, Def. Ex. 6 to Mosley Deposition):

| DATE | # TRIPS | DATE | # TRIPS | DATE | # TRIPS | DATE | # TRIPS |
|------|---------|------|---------|------|---------|------|---------|
| 9/6/16 | 2 | 1/24/17 | 7 | 3/29/17 | 5 | 5/27/17 | 2 |
| 9/9/16 | 5 | 2/11/17 | 1 | 4/6/17 | 5 | 6/7/17 | 6 |
| 9/14/16 | 4 | 2/12/17 | 2 | 4/13/17 | 3 | 6/16/17 | 4 |
| 9/24/16 | 4 | 2/24/17 | 3 | 4/18/17 | 2 | 7/5/17 | 4 |
| 10/18/16 | 1 | 2/25/17 | 10 | 4/20/17 | 5 | 7/14/17 | 6 |
| 10/21/16 | 3 | 3/6/17 | 2 | 4/25/17 | 4 | 7/16/17 | 6 |
| 10/26/16 | 6 | 3/13/17 | 1 | 5/5/17 | 6 | 7/19/17 | 1 |
| 11/13/16 | 1 | 3/14/17 | 4 | 5/11/17 | 5 | 7/30/17 | 1 |
| 11/19/16 | 2 | 3/16/17 | 4 | 5/18/17 | 4 | 8/2/17 | 4 |
| 1/14/17 | 8 | 3/21/17 | 5 | 5/19/17 | 4 | | |
| 1/19/17 | 3 | 3/24/17 | 7 | 5/24/17 | 3 | | |

GPS data reports conclusively establish that Mosley regularly traveled on Paper Mill Road to Merchants (as well as other public roads such as Bay Bridge Road, Herbert Street, Chin Street, Woodland Avenue, and Telegraph Road) (Ex. A ¶ 8), and these real-time reports parallel the Convermat moves Mosley recorded on his load sheets. For example:

- Mosley's January 14, 2017 load sheet indicates four trips with a 99 Series trailer from KC's North Dock to Merchants on the night shift in day cab 140. (Ex. R (SIX 2790)). The January 14, 2017 GPS report for day cab 140 chronicles three of those trips prior to midnight. (Ex. A, Ex. 2 (VC 133, 153-162)).

- On February 12, 2017, Mosley recorded two Convermat trips from the K-Cop lot to Merchants at the beginning of his shift in truck 119 (Ex. R (SIX 2804)); GPS data tracks his movement in truck 119 from the KC mill to Merchants. (Ex. A, Ex. 2 (VC 163,174-180)).

- On March 21, 2017, Mosley recorded five Convermat trips from the North Dock to Merchants in truck 2029 (Ex. R (SIX 2827)); GPS data tracks three of his trips prior to midnight and shows him traveling on Bay Bridge Road, Paper Mill Road, Telegraph Road, and Chin Street. (Ex. A, Ex. 2 (VC 187, 212-224)).

- On April 13, 2017, Mosley recorded three trips in a 99 series trailer from the North Dock to Merchants in truck 2029 (Ex. R (SIX 2838)); GPS data tracks Mosley's trips and travel on Bay Bridge Road, Paper Mill Road, Woodland Avenue, and Herbert Street. (Ex. A, Ex. 2 (VC 225-234)).

- On May 18, 2017, Mosley recorded three trips in a 99 series trailer in truck 2029 from the K-Cop lot to Merchants and one trip from the North Dock to Merchants (Ex. R (SIX 3605)); GPS data tracks each of these trips.  (Ex. A, Ex. 2 (VC 235, 265-277)).

- On June 7, 2018, Mosley recorded four trips in truck 2041 from the K-Cop lot to Merchants and two trips from the North Dock to Merchants (Ex. R, (SIX 3580)); GPS data shows three of those trips prior to midnight.  (Ex. A, Ex. 2 (VC 278-294)).

- On July 16, 2017, Mosley recorded six trips of a loaded 99 series trailer in Truck 149 from the North Dock to Merchants (Ex. R (SIX 2866)); GPS data confirms three of those trips prior to

midnight as well as his travel on Bay Bridge Road, Paper Mill Road, Herbert Street, and Woodland Avenue. (Ex. A, Ex. 2 (VC 295, 319-332)).

- On August 2, 2017, Mosley recorded six trips from the K-Cop lot with trailers loaded with Convermat to Merchants (Ex. R (SIX 3630)); once again, the GPS report documents the first four trips prior to midnight.  (Ex. A, Ex. (VC333-364)).[13]

Moreover, all of the Convermat rolls were shipped outside of Alabama. For example:

- On September 6, 2016, Mosley transported Convermat rolls in trailers 9918 and 9919 to Merchants (Ex. R (SIX 2766, lines 3 & 5)).[14] The KC Load Tally Reports for trailers 9918 and 9919 on September 6 show a Purchase Order #6128. (Ex. L 39:1-5; Ex. S (Merchants Transfer Documents) (MTC 1, 6)). The Bills of Lading for PO #6128,[15] dated September 9 & 16, 2016, show that the rolls were picked up by an over-the-road driver and transported to Laredo, Texas. (Ex. S (MTC 3, 8, 11 *see also* MTC 5, 10, 13)).

Other out-of-state shipments of Convermat rolls that were initially transported by Mosley are summarized as follows:

---

[13]  Mosley testified that he sometimes took Convermat rolls to Merchants and sometimes he put them on the yard. (Ex. B 116:8-117:5). His testimony is consistent with Nettles and Cooper's testimony that drivers took Convermat rolls from the dock and dropped them on the yard after the doors were full or Merchants had closed. (Ex. C 56:2-6; Ex. I 32:22-33:21, 77:18-79:7).

[14]  Merchants produced inbound receipts, run schedules, and outbound bills of lading documenting the tracking of Convermat rolls from the KC mill to Merchants and then on to their final destination out-of-state. (Ex. L 37:12-38:12; Ex. S). A day or so before the runs are made, Merchants receives a "Convermat Run Schedule" from KC. (Ex. L 20:22-22:12, 32:21-33:13, 39:21-40:12; Ex. S (MTC 2)). It includes the Convermat PO number and the destination. For example, on MTC 2, which included a load that was moved by Mosley to Merchants, the destination for PO 6128 was "ABS," which is in Laredo, Texas. (Ex. L 39:9-40:12; Ex. S (MTC 2)).

[15]  Merchants creates the bill of lading which documents the shipment of the order, identifies the PO number, and describes the number of rolls, the weight, the trailer number, the carrier, and the destination of a given shipment. (Ex. L 22:13-24:7; Ex. S (MTC 3)). Merchants produced voluminous bills of lading associated with rolls transported by SIX drivers, all of which were bound for destinations outside the state. (Ex. L 37:7-11). SIX has provided the Court with a small sample of the documents available showing the out-of-state shipments.

| Date of Move to Merchants | PO # | Trailer # | Destination | Date Shipped from Merchants | Citation to Record |
|---|---|---|---|---|---|
| 01/14/2017 | 7292 7297 | 9915 | Mexico Laredo, TX | 01/17/2017 01/24/2017 | Ex. R SIX 2790 Ex. S MTC 48-57 |
| 05/05/2017 | 8134 | 9915 | Green Bay, WI | 05/12/2017 | Ex. R SIX 3597 Ex. S MTC 244-248 |
| 07/05/2017 | 8118 8525 | 9924 | Dominican Republic Green Bay, WI Fontana, CA | 07/13/2017 07/20/2017 07/24/2017 | Ex. R SIX 2849 Ex. S MTC 140-150 |

Mosley testified that when he became lead driver, he was not allowed to go to Merchants "too much" because he was supposed to stay at the mill. (Ex. B 158:18-159:2). However, Mosley cannot remember when he became the lead driver and he cannot remember whether he made a trip to Merchants after he became lead driver. (Ex. B 160:12-161:7). On that issue, Mosley defers to his supervisor, Shelly Asmus. *Id*. Asmus confirms he assigned Convermat shifts to Mosley and that Mosley continued to make Convermat trips to Merchants after he became lead driver. (Ex. B 93:4-16, 107:18-108:1-12; Ex. D 58:15-17; Ex. Q ¶ 3). As demonstrated above, Mosley's load sheets after he became lead driver, as well as the GPS reports, also demonstrate that he continued to transport products to Merchants. Likewise, Nettles also assigned Mosley to do a Convermat/shuttle shift on multiple occasions, which Mosley accepted. (Ex. I 65:9-18). Merchants' 30(b)(6) witness, Lisa Story, whose primary duty was to oversee the Convermat account, knew of Mosley and personally saw him deliver Convermat from KC. (Ex. L 49:19-50:5).

Finally, the DOT exercised its jurisdiction over Mosley while he was working for SIX. On November 15, 2017, Mosley was traveling from the mill to the DC in a rental truck and was pulled over by the DOT on Herbert Street, and the DOT cited him for not having the proper placard on his vehicle and for having a light out. (Ex. B 138:7-141:10, Def. Ex. 15; Ex. C 108:22-109:23; Ex. I 84:6-14).  Mosley told the DOT officer that he was in a "yard truck," but the DOT officer said it was all the "same [as it was] being used on [a] public roadway[]." (Ex. B 140:6-22).

IV.     **Oscar Gibson drove on public roads transporting goods in the continuous stream of interstate commerce.**

Oscar Gibson was hired as a Class A driver and was first employed by SIX from March 2, 2016 until September 23, 2016 when he quit. (Ex. C 18:15-19:16; Ex. G 15:7-23). He was rehired in April 2017 and worked at SIX until he walked off the job on October 4, 2017.  (Ex. A ¶ 13; Ex. G 26:23-27:21). Gibson was assigned to KC his entire employment.  (Ex. G 20:2-12). Gibson was hired in accordance with all Federal Motor Carrier Safety Regulations. (Ex. G, SIX Ex. 3, 4). Gibson was required to have and maintain his CDL and underwent a DOT physical and drug test, as well as a motor vehicle record review.  (Ex. G 23:20-24:10, 27:22-28:10, 32:11-13, SIX Ex. 3, 4). Gibson was required to adhere to the Federal Motor Carrier guidelines, and he was trained on over-the-road driving, yard spotting, vehicle inspections, hours of service, and defensive driving. (Ex. G 24:11-26:4, 32:14-17, SIX Ex. 3, 4).

Gibson worked the day shift in 2016 and the night shift in 2017. (Ex. G 41:8-21). He testified that he used spotter trucks and day cabs in 2016, and only spotter trucks in 2017; however as detailed below, the latter contention is implausible because the record conclusively establishes he drove a day cab in 2017. (*Id*. 42:3-9, 56:7-13, 94:4-19).

Like Mosley, Gibson filled out load sheets documenting where he moved each trailer. (Ex. G 72:18-73:17; Ex. T (Gibson load sheets)). Gibson wrote down the truck number as well as the trailer number he moved, whether it was loaded, where he picked it up, and where he took the trailer in the "drop" column. (*Id*. 74:21-75:14, 82:9-12).

A.     **Gibson transported tissue paper to the DC.**

Gibson transported tissue paper loads from the mill to the DC, as often as five to six loads a day.  (Ex. G 59:1-60:15, 63:8-18). Gibson exited out of KC's gate and traveled on public roads, Bay Bridge Road and Herbert Street, when transporting the tissue paper. (*Id*. 47:8-48:19). Gibson

19

recorded these trips on his load sheets with the notation "West" under the "P/U" column and the notation "DC" under the "Drop" column. (*Id*. 75:8-76:17). The following chart summarizes Gibson's entries on his load sheets showing his transport of the tissue paper from the mill to the DC (Ex. T, Def. Ex. 10 to Gibson Deposition):[16]

| DATE | # TRIPS | DATE | # TRIPS | DATE | # TRIPS | DATE | # TRIPS |
|------|---------|------|---------|------|---------|------|---------|
| 6/5/14[17] | 5 | 5/19/17 | 6 | 6/18/17 | 8 | 7/15/17 | 7 |
| 9/5/16 | 6 | 5/20/17 | 1 | 6/21/17 | 7 | 7/16/17 | 7 |
| 9/6/16 | 4 | 5/21/17 | 2 | 6/22/17 | 4 | 7/19/17 | 3 |
| 9/10/16 | 5 | 5/24/17 | 4 | 6/26/17 | 6 | 7/20/17 | 3 |
| 9/11/16 | 2 | 5/25/17 | 3 | 6/27/17 | 7 | 7/24/17 | 1 |
| 9/15/16 | 2 | 6/2/17 | 4 | 6/30/17 | 4 | 7/28/17 | 3 |
| 9/19/16 | 2 | 6/3/17 | 6 | 7/1/17 | 7 | 7/29/17 | 4 |
| 9/20/16 | 2 | 6/8/17 | 8 | 7/2/17 | 6 | 8/2/17 | 5 |
| 5/10/17 | 3 | 6/9/17 | 1 | 7/6/17 | 5 | 8/3/17 | 4 |
| 5/11/17 | 3 | 6/13/17 | 5 | 7/10/17 | 6 | 8/7/17 | 5 |
| 5/15/17 | 9 | 6/16/17 | 5 | 7/11/17 | 6 | 8/8/17 | 4 |
| 5/16/17 | 8 | 6/17/17 | 7 | 7/14/17 | 7 | 8/11/17 | 5 |

### B.   Gibson transported Convermat rolls to Merchants.

Gibson admits that when he was on day shift, he transferred trailers loaded with Convermat rolls to Merchants outside KC's gate and on public roads. (Ex. G 70:15-72:21, 93:19-21). While Gibson denied transporting loads to Merchants at night in 2017 at certain times in his deposition (*id*. 70:3-9, 93:22-94:3), his testimony on this issue is entirely inconsistent and contradictory. (*Id*. 104:13-105:9). Gibson first testified that he recorded in the drop column of his load sheets where he took the trailer, but he later testified when he wrote Merchants he actually dropped the trailers on the yard. (*Id*. 75:11-14, 78:13-79:5, 80:4-87:13, 102:1-105:23). Gibson testified he did so because Mosley, the lead driver on the "D" night shift, told him to write Merchants when he

---

[16] Gibson's transport of tissue paper to the DC is highlighted in purple. (Ex. T). Gibson's transport of Convermat rolls to Merchants is highlighted in yellow. (*Id*.).

[17] This load sheet had the incorrect date of 6/5/14, but Gibson did not work for SIX in 2014. (*Id*. 73:18-74:5).

worked with him. (*Id.* 78:23-79:6, 80:17-81:15, 105:15-23). Yet, Gibson contradicted that testimony stating he does not remember working with Mosley. (*Id.* 105:15-107:1). Gibson also testified that he only drove jockey trucks on the night shift in 2017 and never drove to Merchants (*id.* 42:3-9), but then testified that he took a load to Merchants in 2017, just not in a jockey truck. (*Id.* 104:13-105:6). Gibson also testified in his deposition that he did not drive on Paper Mill Road to get from the mill to the DC in 2017, contradicting his sworn interrogatory answers: "I would travel on Paper Mill Road…in a SIX vehicle almost every shift when driving between the mill or distribution center." (Ex. U (Gibson's Response to SIX Interrogatories), No. 3). Nettles could not recall an instance when Gibson put on his load sheet that he delivered a Convermat roll to Merchants and Nettles saw the load in the yard the next morning. (Ex. I 75:10-21).

Despite Gibson's incoherent and conflicting testimony, he traveled on Paper Mill Road to Merchants numerous times in 2017. For example, he completed this load sheet on May 22, 2017:



(Ex. T (SIX 3659)).  Truck 2029 is a day cab. (Ex. A ¶ 8, Ex. 1; Ex. I 76:12-16).  Line 3 of the above-referenced load sheet shows that Gibson picked up a Convermat roll from the K-Cop lot using a 99-series trailer and delivered it to Merchants. (Ex. I 75:22-76:2). Line 11 evidences a load using another 99-series trailer from the "ND," which is the North Dock, to the "MTC," meaning Merchants; this evidences a Convermat load.  (Ex. I 74:6-75:13).

Real-time GPS data from day cab 2029 shows that Gibson transported the rolls to Merchants on May 22, 2017 and mirrors Gibson's load sheet:

- Gibson started driving on his shift at 5:45 p.m. and traveled from the mill to Merchants on Paper Mill Road arriving to Merchants at 5:59 p.m., corresponding with line 1 of his load sheet. (Ex. A, Ex. 2 (VC 48)).

- Gibson then traveled on Paper Mill Road going back to the mill arriving at 6:21 p.m., corresponding with line 2 of his load sheet. (*Id.* (VC 49)).

- Gibson drove back to Merchants arriving at 6:36 p.m., corresponding with line 3. (*Id.* (VC 49-50)).

- Gibson returned to the mill at or about 7:02 p.m., corresponding with line 4. (*Id.* (VC 50-51)).

- About twenty minutes later, Gibson set out again on Paper Mill road and traveled back to Merchants arriving at 7:25 p.m., corresponding with line 5 of his load sheet. (*Id.* (VC 51)).

- At 7:56 p.m., Gibson traveled down Paper Mill road back to the mill arriving at about 8:01 p.m., corresponding with line 6 of his load sheet. (*Id.* (VC 52-53)).

- Gibson then drove around the mill for a few minutes at low speed, corresponding with line 7 of his load sheet, before he set off again down Paper Mill road arriving at Merchants at 8:28 p.m., corresponding with line 8 of his load sheet. (*Id.* (VC 53)).

- Gibson left Merchants at about 8:34 p.m. and traveled back to the mill where he stayed until 10:22 p.m., making moves on the yard consistent with lines 9 and 10. (*Id.* (VC 54-57)).

- At approximately 10:26 p.m. Gibson set off for Merchants again arriving at 10:32 p.m., for his last Convermat load shown on line 11. (*Id.* (VC 57-58)).

Similarly, on May 17, 2017, Gibson was operating the same day cab, truck 2029, and the first four moves on his load sheet are to Merchants (Ex. I 76:12-16; Ex. T (SIX 2399-2401)):

| Date: 5-17-17 | | | | | Driver: O. Gibson | |
| Shift: "D" | | | | | Truck: 2029 | |

| | Carrier | Trailer# | L/E | PU | Time | Drop | Time |
|---|---|---|---|---|---|---|---|
| ① | SIX | 9917 | L | Mill | | MCT | |
| ② | SIX | 9919 | L | Mill | | MCT | |
| ③ | SIX | 9920 | L | Mill | | MCT | |
| ④ | SIX | 9914 | L | Mill | | MCT | |
| ⑤ | SIX | 9923 | L | NLD | | KCOP | |
| ⑥ | SIX | 9916 | L | NLD | | KCOP | |
| ⑦ | SIX | 9923 | L | NLD | | KCOP | |
| ⑧ | SIX | 9918 | E | Yard | | NLD | |

(Ex. T (SIX 3641)). The GPS real-time data confirms Gibson's four trips to Merchants that evening at the beginning of his shift.  (Ex. A, Ex. 2 (VC 1, 23-31)).[18]

The following chart summarizes Gibson's entries on his load sheets showing his transport of Convermat rolls to Merchants (Ex. T):

| DATE | # TRIPS |
|---|---|
| 9/13/16 | 1 |
| 5/4/17 | 1 |
| 5/17/17 | 4 |
| 5/22/17 | 5 |

| DATE | # TRIPS |
|---|---|
| 5/25/17 | 4 |
| 6/9/17 | 2 |
| 6/10/17 | 6 |
| 6/19/17 | 1 |

| DATE | # TRIPS |
|---|---|
| 6/28/17 | 1 |
| 6/29/17 | 1 |
| 7/27/17 | 2 |

Moreover, there is ample evidence that Convermat loads transported by Gibson were destined for locations outside of Alabama; the following are examples:

| Date of Move to Merchants | PO # | Trailer # | Destination | Date Shipped from Merchants | Citation to Record |
|---|---|---|---|---|---|
| 05/22/2017 | 8040 | 9923 | Las Vegas, NV | 05/26/2017 | Ex. R SIX 3659 Ex. S MTC 341 343 |
| 05/25/2017 | 8433 | 9915 | Green Bay, WI | 06/01/2017 | Ex. R SIX 3661 Ex. S MTC 356-358 |
| 06/10/2017 | 8400 | 9915 | Green Bay, WI | 06/13/2017 | Ex. R SIX 3665 Ex. S MTC 376-378 |

---

[18]   Asmus also testified that Gibson was assigned and made Convermat trips while he was employed at SIX in 2017.  (Ex. D 58:12-14, 65:23-66:15).  Merchants' 30(b)(6) witness knew of Gibson and saw him deliver loads from KC.  (Ex. L 27:23-28:18, 31:20-32:4, 50:6-9). Nettles also testified that he trained Gibson on Convermat and assigned him Convermat shifts and that he accepted that assignment on multiple occasions.  (Ex. I 65:19-66:3, 88:6-21).

| Date of Move to Merchants | PO # | Trailer # | Destination | Date Shipped from Merchants | Citation to Record |
|---|---|---|---|---|---|
| 06/10/2017 | 8400 | 9917 | Green Bay, WI | 06/21/2017 | Ex. R SIX 3665 Ex. S MTC 383-385 |

Therefore, there can be no genuine dispute that Gibson drove on public roads transporting goods in the continuous stream of interstate commerce.

## V.    Corwin Scott drove on public roads transporting goods in the continuous stream of interstate commerce.

Corwin Scott was hired by SIX to perform the same job duties as he performed for Lazer Spot.  (Ex. H 99:7-100:4).  Scott resigned on July 24, 2016 to take a position at KC.  (*Id*. 100:15-21, 108:14-23).  He worked the night shift.  (*Id*. 113:3-4). Scott was hired in accordance with all Federal Motor Carrier Safety Regulations. (*Id*., SIX Ex. 2).  Scott was required to have and maintain a CDL to work for SIX.  (Ex. H 101:23-102:6, 106:1-16, SIX Ex. 2).  He also had a DOT physical and drug screen, and he consented to a search of his driving records.  (Ex. H 102:7-103:12, SIX Ex. 2). He understood he could be disciplined by SIX for driving violations. (Ex. H 106:1-5).

Scott transported finished tissue paper from the mill to the DC on a daily basis. (Ex. H 65:11-69:6, 72:15-73:1 ("That's an everyday job. We do that every day."), 112:7-21). When transporting the paper, he drove on Bay Bridge Road and Herbert Street. (*Id*. 65:19-67:15). He denies ever transporting a Convermat roll to Merchants (*Id*. 118:6-21), but Nettles testified that Scott transported Convermat rolls to Merchants on at least one shift. (Ex. I 66:4-21).

## VI.    SIX drivers could have been reasonably expected to drive in interstate and foreign commerce.

Any SIX driver assigned to KC could have been reasonably expected to perform any of the driver duties required by the KC contract as well as drive intermodal freight in interstate and foreign commerce. (Ex. A ¶ 15; Ex. K ¶ 13).  While there are only three remaining plaintiffs in this suit, this lawsuit previously included up to 19 plaintiffs alleging identical job duties and

identical claims against SIX.  (Second Amended Complaint, Doc. 67).  Tellingly, the former plaintiffs consistently transported tissue paper from the mill to the DC on public roads, Convermat rolls from the mill to Merchants on public roads, and transported intermodal freight on public roads in interstate and foreign commerce.

For example, Soloman Curry transported Convermat rolls from the mill to Merchants, and he frequently transported finished tissue paper from the West Dock to the DC which was transported to KC's out-of-state customers. (Ex. A ¶ 15, Ex.7). As did former plaintiffs Marcus Shack, Kenneth Nettles, Henry Calhoun, William Clifton, Bryan Freeman, Christopher Wrightington, and Timothy Bolar. (*Id*.).  Former plaintiffs Taurus Thompson, Bernard Woulard, Semaj Britford and Jawarren Hector also hauled finished products to Merchants. (*Id*.)

In addition, all SIX drivers are subject to being called to haul intermodal freight. (Ex. A ¶ 14). Bernard Woulard and Taurus Thompson were originally assigned to KC but were reassigned by SIX to haul intermodal cargo. (Ex. M ¶ 8). Former plaintiff Ronald Johnson, was originally assigned to do intermodal work but was later reassigned to KC. (Ex. A ¶ 14). Another former plaintiff, Brian Freeman, performed intermodal work and KC work at the same time. (Ex. I 83:1-12). Drivers John Anderson and Scott Glover, who are not and have not been parties to litigation, were previously assigned to haul intermodal freight but were later reassigned to work at KC. (Ex. M ¶ 8). Will Greene and David Foster, who filed an identical lawsuit against SIX in this Court (*David Foster et al. v. Southern Intermodal Xpress, LLC, et al.*, Case No.: 1:16-CV-00629), also worked both at KC and hauled intermodal freight at the same time. (Ex. A ¶ 14; Ex. I 83:1-12).[19]

---

[19]  In addition, when Oscar Gibson walked off the job in 2017, SIX considered moving him to do intermodal work and considered moving a driver performing intermodal work to KC as his replacement.  (Ex. A ¶ 13, Ex. 6).

**VII.    SIX's classification of drivers and decision to pay overtime.**

When classifying its drivers as exempt, SIX evaluated what KC was asking the SIX drivers to do and how Lazer Spot classified its drivers as the previous contractor doing the same exact work.   (Ex. C 90:10-91:3).   In addition, SIX reviewed the Motor Carrier Act exemption and Department of Labor guidance and spoke with former Lazer Spot drivers. (Ex. C 90:10-94:23; Ex. M ¶ 6). At one point SIX contacted the DOL and spoke with a representative who told them that its drivers were properly exempt. (Ex. M ¶ 6).  SIX also took into account that its drivers are not hired to work only at KC, because they might drive intermodal freight as well.  (Ex. C 92:20-93:12). SIX has always understood that Herbert Street and Paper Mill Road are public roads because they are open to travel by the public. (Ex. C 94:8-23). SIX also relied on a map published by Mobile County Engineering which shows that Herbert Street is a public road that leads into the Distribution Center. (Ex. A ¶ 16, Ex. 8).

SIX has always maintained and continues to maintain that the MCE applies to its drivers who work at KC. (Ex. C 61:19-23, 133:16-22). However, after it settled the previous lawsuit[20] only to face a second lawsuit with nineteen additional plaintiffs, SIX made the business decision to defend its classification and start paying overtime pay in order to disincentivize counsel from adding more plaintiffs and to stop the clock for potential damages. (Ex. A ¶ 17; Ex. C 113:19-114:9). Drivers assigned to KC started receiving overtime pay on October 23, 2017. (Ex. A ¶ 17).

---

[20]   SIX denied all liability in the first lawsuit and settled only to avoid the costs of litigation, a decision it now very much regrets. (Ex. A ¶ 17).

## ARGUMENT

### I.     Summary judgment standard.

Summary judgment is warranted when the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  While the Court is required to view the evidence and factual inferences in the light most favorable to the non-moving party, "the Court must be mindful of the purpose of Rule 56 which is to eliminate the needless delay and expense to the parties and to the Court occasioned by an unnecessary trial.  Consequently, the non-moving party cannot merely rest upon his bare assertions, conclusory allegations, surmises or conjectures." *Nolasco v. AKS Cartage Corp.*, 2018 WL 2322599, at *4 (S.D. Fla. May 22, 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1441 (11th Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted).

### II.     Overview of the Motor Carrier Act Exemption.

The FLSA requires payment of time-and-a-half for hours in excess of 40 in a workweek, unless an exemption applies. 29 U.S.C. § 207(a)(1). Under the Motor Carrier Act exemption (MCE), "[t]he provisions of section 207 of this title shall not apply with respect to . . . any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49. . . ." *Abel v.*

*Southern Shuttle Services, Inc.*, 631 F.3d 1210, 1212 (11th Cir. 2011) (citing 29 U.S.C. § 213(b)(1)).  The burden is on the employer to show that an exemption exists.  *Id.*

While the Eleventh Circuit has previously applied a "narrow reading" of the exemption *Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009), the United States Supreme Court in *Encino Motorcars, LLC v. Navarro* has overruled that standard: "[b]ecause the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, 'there is no reason to give them anything other than a fair (rather than a "narrow") interpretation.'" *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (citation omitted)); *see e.g. West v. Southern AG Carriers, Inc.*, 2018 WL 2753029, at *6 (M.D. Ga. Apr. 27, 2018) (applying "fair reading" standard).  Moreover, the Motor Carrier Act is a remedial statute and should be broadly construed.  *Rodriguez v. Pan & Plus Baking, LLC*, 2013 WL 1681839, at *2 (S.D. Fla. Apr. 17, 2013) (citing *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 946 (11th Cir. 1969)); *see also Finn v. Dean Transp., Inc.*, 53 F. Supp. 3d 1043, 1053 (M.D. Tenn. 2014) ("In other words, because the MCA exemption is triggered when the DOT has jurisdiction over an employee, and that jurisdiction is *not* construed narrowly, it would be incongruous to construe the MCA exemption to the FLSA 'narrowly' against an employer.").  Whether an employee meets the criteria for an exemption is a question of law.  *Pioch v. IBEX Eng'g Servs., Inc.,* 825 F.3d 1264, 1268 (11th Cir. 2016).  Thus, the question for the Court is whether, given a fair reading of the exemption, Plaintiffs are exempt based on the undisputed facts.

There are two requirements for an employee to be subject to the MCE.  *Walters v. Am. Coach Lines, Inc.*, 575 F.3d 1221, 1227 (11th Cir. 2009).  "First, his employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA."  *Id.*  "Second, the employee's business-related activities must directly affect the safety of operation of motor vehicles

in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." *Id*. (internal quotes omitted); *accord* 29 C.F.R. § 782.2(a).  The undisputed record in this case shows there is no genuine dispute of fact on either element, and SIX is entitled to judgment as a matter law.

III.     **SIX is a motor carrier subject to the jurisdiction of the DOT.**

An employer is subject to the Secretary of Transportation's jurisdiction if it shows it is (a) a motor carrier and (b) transports passengers or property in interstate commerce. *Huete v. Arguello Delivery & Cargo Corp.*, 2016 WL 4077098, at *2 (S.D. Fla. July 29, 2016). "Motor Carrier" means "a person providing motor vehicle transportation for compensation." *See* 49 U.S.C. § 13102(14). A commercial motor vehicle has a gross vehicle weight greater than 10,000 pounds. 49 U.S.C. § 31132(1). "[T]he Secretary of Transportation need not actually exercise his power to regulate under the Motor Carrier Act; an exemption under section 13(b)(1) is created so long as the Secretary has the authority to regulate over a particularly category of employees." *Spires v. Ben Hill County*, 980 F.2d 683, 686 (11th Cir. 1993).

There is no dispute SIX is a "motor carrier" as defined by the Act.  SIX is licensed with the DOT and has FMCSA authorization necessary to be an interstate carrier which conclusively establishes that the DOT has jurisdiction over the company.  *See Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 182 (11th Cir. 1991) (per curiam) ("[T]he permit issued by the [DOT] indicates that jurisdiction has already been exercised.  Thus, it is clear that [defendant] is a motor carrier subject to the Secretary's jurisdiction.") (internal citation omitted).  Second, SIX received compensation from its clients to transport goods in interstate commerce, the vast majority of which involves intermodal transport.  *See, e.g.*, *Walters*, 575 F.3d at 1227-29.  Third, Plaintiffs operated trucks weighing over 10,000 pounds.  (Ex. A ¶ 3).  SIX's trucks and drivers have been the subject

of DOT inspections, and SIX maintains records and qualifies its drivers as required by DOT regulations.  *See Mena v. McArthur Dairy, LLC*, 352 F. App'x 303, 306 (11th Cir. 2009).  And, as discussed in greater detail below, the transportation is interstate in nature because the goods moved by SIX drivers on public roads are bound for out-of-state destinations.

IV.     **Plaintiffs were engaged in activities directly affecting the safe operation of motor vehicles on public roads in the transportation of property in interstate commerce.**

To satisfy the second prong of the MCE, the plaintiffs must have (a) engaged in activities affecting the safe operation of motor vehicles (b) while transporting passengers or property in interstate commerce. *Nolasco v. AKS Cartage Corp.*, 2018 WL 2322599, at *10 (S.D. Fla. May 22, 2018); *Pritchett v. Werner Enters., Inc.*, 2013 WL 4524337, at *2 (S.D. Ala. Aug. 27, 2013).

A.      **Plaintiffs were engaged in activities affecting the safe operation of motor vehicles on the public highways.**

Courts have routinely held that, as a matter of law, employees who drive motor vehicles affect the safety of operation of motor vehicles as required to satisfy the second prong of the exemption. *See, e.g., Levinson v. Spector Motor Serv.*, 330 U.S. 649, 685 (1947); *Morris v. McComb*, 332 U.S. 422, 436-38 (1947); *Nolasco*, 2018 WL 2322599, at *11 ("It is beyond dispute that a driver affects the safety of operation of motor vehicles.").

Federal Motor Carrier Safety Regulations define a driver as "any person who operates a commercial motor vehicle." 49 C.F.R. § 390.5. A "commercial motor vehicle" is "any self-propelled or towed motor vehicle used on a highway in interstate commerce to transport passengers or property…." *Id*.[21] "Highway" means "any road, street, or way, whether on public or private property, open to public travel." *Id*. And finally, "open to public travel" means "that the road

---

[21] All of the vehicles operated by SIX drivers weigh more than 10,000 pounds (Ex. A ¶ 3); thus, the "small vehicle exception" to the MCE is inapplicable.  *See e.g., Santana v. Lykes Exclusive, LP*, 2013 WL 1001850, at *3 (S.D. Fla. Mar. 13, 2013).

section is available, except during scheduled periods, extreme weather or emergency conditions, passable by four-wheel standard passenger cars, and open to the general public for use without restrictive gates, prohibitive signs, or regulation other than restrictions based on size, weight or class of registration." *Id. See also Buscarino v. TQ Logistics, Inc.*, 2010 WL 3211708, at \*4-5 (D. S.C. Aug. 11, 2010) ("the spotters' actions in taking the trailers across the public road to the overflow lot could have initiated the trailers' practical continuity of movement into interstate commerce"); *Pritchett v. Werner Enters., Inc.*, 2013 WL 4524337, at \*3 (S.D. Ala. Aug. 27, 2013) (driving loaded vehicles on public highways was sufficient to implicate the exemption); *cf. Billingslea v. Southern Freight, Inc.*, 699 F. Supp. 2d 1369, 1377 (N.D. Ga. 2010) ("the only vehicle that Plaintiff drove . . . he could not, and did not, take on to any public roads").

SIX required its drivers, including Plaintiffs, to have and maintain a commercial driver's license, undergo a DOT physical examination and drug test, and consent to a review of their driving record. The drivers were required to undergo training on driving and safety. Moreover, as drivers, Plaintiffs constantly drove trucks on public roads with trailers loaded with KC's products, both in and around the KC facility. It is undisputed that all three Plaintiffs took loads of finished tissue paper from the mill to the DC, traveling on Bay Bridge Road and Herbert Street which are open to public travel without restrictive gates, prohibitive signs, or regulation. It is also undisputed that Mosley and Gibson transported Convermat loads down Paper Mill Road, a public road.[22]

---

[22] Gibson's conflicting testimony concerning his transport of Convermat rolls in 2017 does not create a genuine issue of material fact in the face of overwhelming evidence that he drove Convermat rolls to Merchants in 2017. *Langford v. Rich*, No. CV 605-073, 2006 WL 1549120, at \*2 (S.D. Ga. June 1, 2006) ("where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible to determine ... whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account") (citation omitted).

Therefore, there is no dispute that Plaintiffs engaged in activities that directly affected the safety of operation of motor vehicles on public highways.

**B.      Plaintiffs and other SIX drivers transported property in interstate commerce.**

The record is undisputed that SIX drivers, including Plaintiffs, transported goods on public roads in the continuity of interstate commerce. While Plaintiffs did not transport products across state lines, for purposes of the MCE, "purely intrastate transportation can constitute part of interstate commerce if it is part of a 'continuous stream of interstate travel…' [and there is] "a 'practical continuity of movement' between the intrastate segment and the overall interstate flow." *Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1229 (11th Cir. 2009) (citations omitted); 29 C.F.R. § 782.7 (b)(1) ("Highway transportation by motor vehicle from one State to another, in the course of which the vehicles cross the State line, clearly constitutes interstate commerce. . . .The result is no different where the vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce within the meaning of both acts; the fact that other carriers transport it out of or into the State is not material."); *Featherston v. Lazer Spot, Inc.*, 2018 WL 4088001 (D. Nev. Aug. 27, 2018) (granting summary judgment in favor of Lazer Spot when drivers drove finished goods intrastate a relatively short distance over public roads before they were shipped out-of-state).

"A critical factor in determining a shipment's interstate character is the shipper's 'fixed and persisting intent' at the time of the shipment." *Castillo*, 2017 WL 945188, at *4 (citing *Mena*, 352 F. App'x at 306 and 29 C.F.R. § 782.7(b)(2)). A shipper's intent is based on the totality of the facts and circumstances. *Merchants Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 917 (5th Cir. 1993). "A shipper, however, need not ship goods under specific orders for the motor carrier exemption to apply. The Supreme Court has held that the exemption may apply when goods are shipped based

on an anticipation or understanding of the needs of specific customers." *Giovagnorio v. Am. Recovery Specialists of Orlando, Inc.*, 2011 WL 13118040, at *4 (M.D. Fla. Dec. 20, 2011) (citing *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 570 (1943)); *see also, e.g. Cruz v. Southern Waste Sys., LLC*, 2010 WL 309016, at *4-5 (S.D. Fla. Jan. 25, 2010) (evidence that products were transported to out-of-state locations); *Williams v. Kenco Logistic Servs., Inc.*, No. 809-CV-709-T-26MAP, 2010 WL 2670852, at *4 (M.D. Fla. July 2, 2010) (there is a "fixed and persisting intent" to continue in interstate commerce "[e]ven if a shipper does not know the ultimate destination of specific shipments, [if] it bases its determination on the total volume to be shipped through the warehouse on projections of customer demand") (citing 57 Fed. Reg. 19812-01 at 19813).

Furthermore, once the goods enter into the channels of interstate commerce, a stop in the movement of the goods does not mean they are no longer in interstate commerce. *Jacksonville Paper Co.*, 317 U.S. at 568. "The movement of trucks . . . over the public highways between loading platforms, the garage, storage facilities or terminals, where such movement is either the beginning or continuation of an interstate or foreign journey, is itself transportation in interstate or foreign commerce subject to the jurisdiction of the DOT." *Billingslea*, 699 F. Supp. 2d at 1377 n. 14 (citing Dep't of Labor Field Ops. Handbook § 24b00 (1982)). If the stop represents "a convenient intermediate step in the process of getting them to their final destinations, [the goods] remain 'in commerce' until they reach those points." *Jacksonville Paper Co.*, 317 U.S. at 568; *see e.g. Siller v. L & F Distributors, Ltd.*, 109 F.3d 765, at *2 (5th Cir. 1997) (holding that delivery of goods stored at an in-state warehouse between 6 to 28 days before being delivered was interstate); *Roberts v. Levine*, 921 F.2d 804, 814 (8th Cir. 1990) (six-month storage period did not disrupt interstate commerce).

In this case, it is undisputed that Plaintiffs' "activities were part of a larger, continuous stream of interstate travel." *Castillo,* 2017 WL 945188, at *4. Plaintiffs transported finished tissue paper from the mill to the DC on public roads where it was loaded onto over-the-road trucks for delivery to out-of-state customers. *Cf. Pritchett v. Werner Enterprises, Inc.*, 2013 WL 6909892, at *6–7 (S.D. Ala. Dec. 31, 2013) (drivers did not transport finished products on public roads). KC produces and transports the finished product to the DC in response to customer orders and based on historical customer demand data, and at the time the paper was transported by SIX, KC intended for it to continue on its journey to out-of-state customers in Georgia, Texas, Florida, Ohio and Illinois. (Ex. K ¶¶ 3,10) *Cf. Smith v. Werner Enterprises, Inc.*, 2015 WL 4429046, at *4 (S.D. Ala. July 20, 2015) (no evidence of the shipper's interstate intent when transported by drivers). The finished tissue paper was housed only temporarily at the DC, and no alterations were made to the product before it was shipped. *Jacksonville Paper Co.*, 317 U.S. at 568 ("[a] temporary pause [in a warehouse] does not mean that [the goods] are no longer 'in commerce'"); *Cruz*, 2010 WL 309016, at *5 ("Plaintiff caused goods to travel across state lines by delivering [product] because the [product was unchanged from the time it was delivered and later shipped out of [state].");  *cf. Pritchett*, 2013 WL 4524337, at *4 (product modified).

Plaintiffs also transported finished paper rolls on public roads to Merchants for delivery to customers, all of which are outside the state of Alabama. KC sells these finished paper rolls directly to its customer, Convermat, and no further processing or modification occurs at Merchants. *Cf. Pritchett*, 2013 WL 4524337, at *4 (rolls were not the product sold by Boise and underwent further processing before being transported to out-of-state destination). The run schedule is created by KC and the final out-of-state destination of each roll is known before KC even creates the product for Convermat. *See Jacksonville Paper*, 317 U.S. at 569 (The interstate movement may be part of the

34

"practical continuity of movement" across state lines where the "contract or understanding pursuant to which goods are ordered, like a special order, indicates where it was intended that the interstate movement should terminate."); *cf. Smith*, 2015 WL 4429046, at *4 (S.D. Ala. July 20, 2015) (no evidence of interstate intent). Consequently, the goods Plaintiffs transported on public roads remained in the continuous flow of interstate commerce.

**C.    Plaintiffs engaged in interstate commerce activities with sufficient frequency to qualify for the MCE and/or could have been reasonably expected to transport goods in interstate commerce.**

The evidence is undisputed that Plaintiffs and other SIX drivers frequently drove finished product in interstate commerce; however even if the Plaintiffs dispute what they did and often they did it, it is undisputed that the SIX drivers drove such routes with sufficient frequency to be subject to the exemption, and that the *Plaintiffs could reasonably have been expected to move goods in the stream of interstate commerce at any time*, which also makes them subject to the MCE.

SIX does not have to show that every one of the Plaintiffs had actual involvement in interstate transportation. *Vidinliev v. Carey Intern., Inc.*, 581 F. Supp. 2d 1281, 1286 (N.D. Ga. 2008). An entire class of employees may be 'exempt even though the interstate driving of particular employees was sporadic and occasional, and in practice some drivers would not be called upon for long periods to perform any such work.'" *Id.*, (quoting 29 C.F.R. § 782.2(c)(1) (citing *Morris v. McComb*, 332 U.S. 422, 431 (1947)).  Instead, an employer must show that (a) some of its drivers were involved – by evidence of actual or solicited trips – in interstate motor vehicle transportation, (b) the involvement with interstate motor vehicle transportation was no more than four months prior to the pay period at issue (the "four-month rule") and (c) the plaintiff did make, or could have reasonably have been expected to make, one of those interstate trips. *Vidinliev*, 581 F. Supp. 2d at

1293 (citing *Reich v. Am. Driver Serv.*, 33 F.3d 1153, 1156 (9th Cir. 1994); *Morrison v. Quality Transps. Servs., Inc.*, 474 F. Supp. 2d 1303, 1310 (S.D. Fla. 2007); DOL Fact Sheet #19.

One manner in which Courts make this determination is by using the 4-month rule: "Where a carrier has been shown to operate in interstate commerce, the Secretary of Transportation will assert jurisdiction over an employee for a 4-month period beginning on the last date the employee could have been called upon to make an interstate run." *Ballou v. DET Dist. Co.*, No. 3-03:1055, 2006 WL 2035729, at *14 (M.D. Tenn. July 17, 2006)); *see also Bannen v. Liebert Corp.*, No. CV 01-0490, 2003 U.S. Dist. LEXIS 27939, at *16 (E.D.N.Y. May 28, 2003) ("Plaintiffs … have to show that Defendants, not Plaintiffs, went an entire 4-month period without engaging in some interstate activity. This emphasis on the 'carrier,' rather than the individual plaintiff, is important because it reemphasizes the fact that the Court's central inquiry focuses upon whether Plaintiffs 'regularly travel interstate or reasonably are expected to do interstate driving."); *Application of the Federal Motor Carrier Safety Regulations*, DOT Notice of Interpretation, 46 Fed. Reg. 37902-02 (July 23, 1981) ("Evidence of driving in interstate commerce or being subject to being used in interstate commerce should be accepted as proof that the driver is subject to 49 U.S.C. 304 for a 4-month period from the date of the proof.")  In this case, all three Plaintiffs testified that they transported tissue paper to the DC on a regular, if not daily, basis. Mosley and Gibson testified that they transported Convermat rolls to Merchants and the record demonstrates that such transfers were made at least every 4 months during their employment. (pgs. 13-24, *supra*).[23] Finally, there

---

[23]  SIX anticipates that Gibson will attempt to rely on selective testimony that he never drove to Merchants during his second period of employment in 2017; however, Gibson's testimony is inherently inconsistent and his conclusory denial is "completely unsupported by any other record evidence [and] insufficient to resist summary judgment." *Castillo*, 2017 WL 945188, at *6 (S.D. Fla. Feb. 10, 2017) (citation omitted) (vague conclusory statements in the face of valid records did not create a genuine issue of fact). Moreover, his testimony is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When

has never been a four-month period that SIX drivers did not transport Convermat rolls, on both the day and night shifts, for the duration of the SIX/KC contract.[24]

Another way drivers are subject to the MCE is "if the carrier has engaged in interstate commerce and Plaintiffs could reasonably be expected as a regular part of their duties to drive one of Defendant's interstate routes. A reasonable expectation means that there is more than a remote possibility." *Walters v. Am. Coach Lines of Miami, Inc*., 569 F. Supp. 2d 1270, 1292 (S.D. Fla. 2008), *aff'd*, 575 F.3d 1221 (11th Cir. 2009). "The issue here, therefore, is whether objectively there can be said to be a 'reasonable expectation' that an interstate trip could be assigned to members of a group, not whether a particular employee subjectively thought he was likely to receive an interstate assignment." *Allen v. Coil Tubing Servs., LLC*, 846 F. Supp. 2d 678, 702 (S.D. Tex. 2012); *Walters v. Am. Coach Lines of Miami, Inc.*, 2009 WL 1708811, at *1–2 (S.D. Fla. June 17, 2009) (the "reasonable expectation" is held by the employer, not the employee) (citing DOT Notice of Interpretation, 46 Fed. Reg. 37902-02).

Mosley, Gibson, and Scott, as well as the other KC drivers, could have been reasonably expected to make any of the routes under the KC contract, including to the DC and to Merchants. SIX drivers were required under the contract with KC to drive finished goods from the mill to the DC and to Merchants, and KC required that every SIX driver be able to perform every driving service under the agreement. *Cf. Pritchett v. Werner Enters., Inc.*, 2013 WL 4524337, at *8 (S.D. Ala. Aug. 27, 2013) (hiring of other drivers to fulfill contract obligation to deliver interstate loads demonstrated that the plaintiffs had no duty to haul those loads). Plaintiffs were trained on every

---

opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Sparman v. Blount Cty. Bd. of Educ*., 2016 WL 5110484, at *3 (N.D. Ala. Sept. 19, 2016).

[24]  (Ex. M, Ex. 1).

route required by the contract, and they, as well as other SIX drivers assigned to KC, transported paper products to the DC and to Merchants on a regular basis. Scott testified that he drove tissue paper to the DC on a "daily" basis. Likewise, SIX drivers (including Gibson) on the day shift frequently took Convermat loads to Merchants, and drivers on the night shift (including Mosley) took loads during the night shift. The transports by SIX drivers to the DC and to Merchants were the first leg of a larger interstate shipment of finished paper goods, as evidenced by KC's testimony that most tissue paper was shipped out-of-state, as well as Merchants' testimony that all Convermat rolls were shipped out-of-state. Therefore, it cannot be disputed that the Plaintiffs and other SIX drivers at KC were reasonably expected to drive a load in interstate commerce. *Chao v. First Class Coach Co.*, 214 F. Supp. 2d 1263, 1275-76 (M.D. Fla. 2001) (finding nothing to rebut assertion that drivers might at any time be assigned to an interstate route).

Finally, the record establishes that there was more than a remote possibility that Plaintiffs could have been called upon to haul intermodal freight in interstate and foreign commerce. Ninety-five percent of SIX's business is the transport of intermodal freight in interstate and foreign commerce. SIX commonly moves drivers back and forth between KC and intermodal work, and six of the former plaintiffs in this lawsuit have performed both types of work. Plaintiffs' job description provides that they may be called to transport freight. SIX also requires all of its drivers to have and maintain a CDL, and if SIX driver loses his CDL, he may not drive until it is reinstated; if not reinstated, he is terminated. Finally, SIX requires all of its drivers to be qualified under DOT regulations and pass background checks, DOT drug tests and physical exams. *Antemate v. Estenson Logistics, LLC*, 2017 WL 5159613, at *2 (C.D. Cal. Nov. 7, 2017) (finding that yard drivers reasonably could have been expected to move goods in the stream of interstate commerce under similar circumstances).

**V.     Plaintiffs cannot establish a "willful" violation.**

Under the FLSA, every action for unpaid overtime compensation or liquidated damages must be commenced within two years "after the cause of action accrued" unless the FLSA violation was "willful," in which case the action "may be commenced within three years after the cause of action accrued. 29 U.S.C. § 255(a). "An employer commits a willful violation if it knew or showed reckless disregard as to whether its conduct was prohibited by the FLSA." *Fears v. Keystone Petrol. Transp.*, 2012 WL 12835497, at *27 (N.D. Ga. Feb. 21, 2012) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 135 (1988)). "Although 'willfulness' has never been defined univocally by courts, it is 'generally understood to refer to conduct that is not merely negligent.'" *Fears*, 2012 WL 12835497, at *27 (quoting *Reich v. Dep't of Conservation & Nat. Res.*, 28 F.3d 1076, 1084 (11th Cir. 1994)).  To establish that the violation of the Act was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was. *Williams v. R.W. Cannon, Inc.*, No. 08-60168-CIV-UNGARO, 2008 WL 4097613, at *17 (S.D. Fla. Sept. 4, 2008).

Plaintiffs have no evidence that SIX willfully violated the FLSA. Instead, SIX has established through evidence that cannot be disputed that any FLSA violation could not be considered willful. First, as established above, the Plaintiffs engaged in activities that are consistent with the MCE, by regularly transporting finished goods bound for out-of-state destinations on roads open for public travel. Moreover, most SIX drivers transport intermodal freight, and SIX commonly reassigned drivers from the KC site to intermodal work.  Even though the remaining three Plaintiffs were not reassigned, all of SIX's KC drivers are subject to be reassigned to transport intermodal freight, or vice versa; consistent with this is SIX's requirement

that all new drivers qualify under the DOT regulations.  In fact, several of the former plaintiffs in this lawsuit were reassigned to transport intermodal freight or transport intermodal freight prior to being assigned to KC. SIX also undertook significant measures to ensure that it was complying with the FLSA by reviewing the Motor Carrier Act exemption provision and Department of Labor guidance.  SIX also spoke with its drivers who previously worked for Lazer Spot and evaluated public Mobile County maps which show the public nature of the roads upon which Plaintiffs traveled.  In addition, once certain SIX drivers raised a question about overtime, SIX's Assistant Site Supervisor called the Department of Labor about the classification of the drivers and he was assured by the DOL that the drivers assigned to KC were exempt. Therefore, it is undisputed that SIX did not willfully violate the FLSA.

## **CONCLUSION**

For the reasons stated above, SIX requests that the Court grant summary judgment in its favor and enter a final judgment in SIX's favor.

Respectfully submitted,

*/s/ Lisa Darnley Cooper*
LISA DARNLEY COOPER (COOPL8509)
J. REBECCA PARKS (PARKJ4161)
*Counsel for Defendant Southern Intermodal
Xpress, LLC*

OF COUNSEL:

HAND ARENDALL HARRISON SALE LLC
Post Office Box 123
Mobile, AL 36601
(251) 432-5511
(251) 694-6375 Fax

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been electronically filed on January 4, 2019 with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all registered counsel of record

Jeremiah J. Talbott, Esq.
Ryan P. Stoner, Esq.
Law Office of Jeremiah J. Talbott, P.A.
900 E. Moreno Street
Pensacola, FL 32503

*Counsel for Plaintiffs*

M. Warren Butler
Starnes Davis Florie LLP
P. O. Box 1548
Mobile, AL 36633-1548

Kevin Young
Katy Smallwood
Seyfarth Shaw LLP
1075 Peachtree Street N.E.
Suite 2500
Atlanta, GA 30309-3958

*Counsel for Defendant Lazer Spot, Inc.*
*& Lazer Spot Holdings Corp.*

*/s/ Lisa Darnley Cooper*