## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| TIMOTHY BOLAR, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:17-00360-JB-B |
| | ) | |
| SOUTHERN INTERMODAL XPRESS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter is before the Court on Defendants' Motions for Summary Judgment.  (Docs. 150 and 151) ("Motions").  The Motions have been fully briefed and are ripe for resolution.[1]

Plaintiffs brought claims against Defendants Lazer Spot, Inc. ("Lazer Spot"), Lazer Spot Holdings Corp. ("Holdings") (together "Lazer Spot Defendants"), and Southern Intermodal Xpress, LLC ("SIX") for allegedly failing to pay Plaintiffs' overtime wages under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.*  ("FLSA").  Specifically, each Plaintiff alleged that one or more Defendants misclassified them as exempt employees pursuant to the Motor Carrier Act exemption contained in 29 U.S.C. § 213(b)(1).  After due consideration, and for the reasons stated in Defendants' briefs and below, Defendants' Motions for Summary Judgment are GRANTED, and Plaintiffs' claims are dismissed with prejudice.

---

[1] This Order follows and articulates the rationale for the Court's Order dated August 21, 2019 (Doc. 174), that the Motions are due to be granted.

I.      **BACKGROUND**

  A.      **Procedural History**

On August 9, 2017, a group of 11 Plaintiffs, including Cleotho Mosley, Corwin Scott, and Oscar Gibson, filed suit against Defendants asserting violations of the FLSA ("*Bolar*").  (Doc. 1).  In December 2018, the Court entered an order consolidating *Bolar* with a later-filed case entitled *Jones, et al. v. Southern Intermodal Xpress, LLC, et al.*, No. 17-cv-520, in which a number of individuals sued SIX for the same FLSA violations asserted in *Bolar*.  (Doc. 43).  The consolidated cases included 20 Plaintiffs, each of whom pursued his claims on an individual basis.  (Doc. 67).  Of those 20 Plaintiffs, seven pursued claims against all Defendants, one pursued claims only against the Lazer Spot Defendants, and 12 pursued claims only against SIX.  (*Id.*).  Although Gibson initially asserted claims against Lazer Spot and Holdings, he later clarified that he was not employed by either entity, and pursued his claims solely against SIX.  (*Id.*).  Mosley and Scott worked for both Lazer Spot and SIX.  (*Id.*).  Over the course of the litigation, 17 Plaintiffs either withdrew their claims or failed to prosecute their claims after their counsel withdrew from representing them.  (*See* Docs. 88-102, 108, 110, 118, 121, 129, 136, 138-140).  At the time Defendants moved for summary judgment, only Mosley, Scott, and Gibson continued to prosecute their claims against Defendants.[2]

---

[2] There is also a subsequent case, *Semaj Britford and Taurus Thompson v. Southern Intermodal et al.*, No. 18-0466-JB-C, in which former Plaintiffs from *Bolar* who were dismissed for failure to prosecute asserted the same claim for overtime compensation against SIX and Lazer Spot in a separate action.  Lazer Spot was voluntarily dismissed as a defendant due to the statute of limitations, and the action has been stayed pending disposition of these motions. (18-cv-466, Doc. 15).

### B.      Factual Background

#### 1.      Lazer Spot and SIX Employed Drivers to Provide Spotting and Shuttling Services at the Kimberly Clark Paper Mill and Distribution Center in Mobile, Alabama

This case arises out of the work that Plaintiffs performed when they were employed by SIX and, in the case of Mosley and Scott, by Lazer Spot, at the paper mill and distribution center operated by Kimberly Clark ("KC") in Mobile, Alabama.[3]  Plaintiffs do not assert that Defendants jointly employed them.  As described below, Plaintiffs did not work for Lazer Spot and SIX at the same time.  Rather, Plaintiffs Mosley and Scott worked for Lazer Spot prior to April 2015, and all three Plaintiffs worked for SIX after April 2015 when Lazer Spot ceased its operations at the KC facilities in Mobile.

Lazer Spot is a third-party logistics company that provides transportation and yard management services to various plants, mills, and consumer-goods companies across the United States.  (Doc. 150-21 at 2).  Among the services it provides are spotting (*i.e.*, moving loaded and empty trailers between two or more points, often in and around a client's facility, and sometimes offsite) and shuttling (*i.e.*, transporting loaded or unloaded trailers over public roads to and from a client's facility).  (*Id.* at 2; Doc. 150-20 at 3, 4).

---

[3] Plaintiffs also named Lazer Spot Holdings Corp. as a defendant in this lawsuit.  (Doc 1).  Holdings did not engage in any operations, employ any workers, or set the terms of employment for any workers at Plaintiffs' worksite. (Doc. 150-20 at 12, 13; Doc. 150-5 at 13, 14).  Holdings merely owns the stock of Lazer Spot, Inc. (Doc. 150-20 at 12).  It is Plaintiffs' burden to establish that Holdings was an employer under the FLSA.  Because Holdings did not employ them during the relevant time period, Holdings is entitled to summary judgment.  *See Freeman v. Key Largo Volunteer Fire & Rescue Dep't, Inc.*, 494 F. App'x 940, 942 (11th Cir. 2012) (*per curiam*) ("To state a claim for failure to pay . . .overtime wages under the FLSA, a plaintiff must demonstrate that . . . he is employed by the defendant."); *Beard v. Langham*, 649 F. Supp. 2d 1332, 1343 (S.D. Ala. 2009) (granting summary judgment to defendants where plaintiffs "failed to demonstrate" that defendants employed plaintiffs within the meaning of the FLSA).  Even if Mosley or Scott could establish that Holding employed them, it would nonetheless be entitled to summary judgment on their claims for the reasons discussed herein with respect to Lazer Spot.

SIX, like Lazer Spot, provides transportation services to its clients and at the KC facilities. SIX's primary business is the transport of intermodal cargo containers loaded with products to and from the Ports of Mobile and New Orleans, but a fraction of SIX's employees provides driving services at the KC facilities in Mobile.  (Doc. 152-1 at 2, 3).  SIX hires all of its drivers in the same manner, regardless of whether they are assigned to work in Mobile or New Orleans and regardless of whether they are assigned intermodal or KC work.  (Doc. 152-1 at 4, 5).  While some drivers are ultimately assigned to primarily work at KC and some are assigned primarily to be an intermodal driver, SIX commonly moves drivers between intermodal freight and KC work. (Doc. 152-3 at 7, 8-10; Doc. 152-4 at 22; Doc. 152-9 at 36, 37).

All Lazer Spot and SIX drivers are required to maintain commercial driver's licenses as a condition of employment, as well as meet other standards set by the federal Department of Transportation.  (Doc. 150-4 at 5).  Lazer Spot and SIX are each licensed with the DOT and have Federal Motor Carrier Safety Administration ("FMCSA") authorization necessary to act as interstate carriers.  (Doc. 150-21 at 2; Doc. 152-1 at 2).

Lazer Spot provided spotting and shuttling services at the KC facilities in Mobile until April 2015 when its contract with KC ended.  (Docs. 150-2 at 3; 150-4 at 3).  On April 1, 2015, SIX assumed responsibility for the spotting and shuttling needs at the KC facilities and hired at least some of the former Lazer Spot drivers; thereafter, Lazer Spot did not engage in any operations or employ any workers at the facility.  (Doc. 150-20 at 3; Doc. 150-13 at 54, 55).  To provide these services, Lazer Spot and SIX employed drivers who transported goods in and around the paper mill and the nearby distribution center ("DC").

The KC mill uses raw fiber materials, including wood pulp and recycled fibers, to manufacture finished paper products such as toilet paper, tissue paper, paper towels, and "Convermat" rolls, which are very large rolls of paper. (Doc. 150-2 at 6; Doc. 150-4 at 2; Doc. 150-13 at 25). KC's Mobile operation consists of two main facilities—a production mill and the DC. (Doc. 150-4 at 2; Doc. 150-5 at 4, 5; Doc. 150-7 at 13, 14; Doc. 150-11; Doc. 150-13 at 25). KC also utilizes a third-party warehouse owned by Merchants Transfer Co. ("Merchants"). (Doc. 150-4 at 5; Doc. 150-5 at 8). The mill, the DC, and the Merchants warehouse are all separated by roads that are open to the public. (Doc. 150-4 at 3; Doc. 150-5 at 6; Doc. 150-7 at 13; Doc. 150-13 at 26-32, 39-41; Doc. 150-11; Doc. 150-15; Doc. 150-16; Doc. 150-17; 150-19 at 3, 4).

Bay Bridge Road bisects the mill and the DC. The mill is located immediately north of Bay Bridge Road and the DC is located immediately south of Bay Bridge Road. (Doc. 150-4 at 3; Doc. 150-7 at 13-20; Doc. 150-13 at 26-32, 39-41; Doc. 150-15; Doc. 150-16; Doc. 150-17). Herbert Street forms a three-way intersection with the south side of Bay Bridge Road and leads to the DC. (Doc. 150-2 at 4, 5; Doc. 150-3; Doc. 150-4 at 3; Doc. 150-7 at 13-20; Doc. 150-13 at 26-32, 39-41; Doc. 150-15; Doc. 150-16; Doc. 150-17). The mill is accessible via Bay Bridge Road and Paper Mill Road, which forms a three-way intersection with the north side of Bay Bridge Road. (Doc. 150-2 at 12; Doc. 150-4 at 3; Doc. 150-7 at 28, 29; Doc. 150-13 at 43-47). Merchants is located off of Paper Mill Road, approximately 1.5 miles to the north of the KC mill. (Doc. 150-4 at 3; 150-6 at 4). Bay Bridge Road, Paper Mill Road, and Herbert Street all function as public thoroughfares and the public utilizes these streets. (Doc. 150-2 at 17, 18; Doc. 150-6 at 4; Doc. 150-5 at 7, 22-24; Doc. 150-7 at 30; Doc. 150-13 at 40, 41, 52, 53; Doc. 150-18 at 2, Ex. 1; Doc. 150-19 at 3-5).

KC contracted with Lazer Spot and, later, SIX, to provide drivers to transport paper products and raw fiber material between the mill, the DC, and Merchants. (Doc. 150-4 at 3). KC required Lazer Spot and SIX to provide drivers to complete three types of trips over the roads around the facilities, as described below.

KC expected all Lazer Spot and SIX drivers to be capable of performing all of the driver services under the parties' respective contracts and did not require any drivers to be assigned solely to one area of the mill or DC. (Doc. 150-4 at 5). The Lazer Spot and SIX drivers who worked at the KC facilities in Mobile were subject to being called upon at any time to drive on public roads to transport finished paper goods and raw fiber material.[4] (Doc. 152-1 at 4; Doc. 150-5 at 11, 16; Doc. 150-6 at 5; Doc. 150-20 at 6).

KC required Lazer Spot and SIX drivers to adhere to all DOT regulations and to maintain a commercial driver's license. (Doc. 150-4 at 5). Per KC's requirements, all of the Lazer Spot and SIX trucks at the Mobile facilities were licensed and tagged in a manner that allowed them to operate on the public roads around the facilities, and the vehicles had to meet annual DOT inspections. (*Id*.; Doc. 150-5 at 9; Doc. 152-11 at 5). The vehicles that Plaintiffs operated at the KC facilities as drivers for Lazer Spot and SIX weighed in excess of 10,000 pounds. (Doc. 150-5 at 9, 10, 20; Doc. 150-21 at 5, Ex. 4; Doc. 152-1 at 2).

### a.    Trips from the Mill to the DC

The KC mill operates 24 hours a day, 7 days per week. (Doc. 150-4 at 4). When all three palletizers (*i.e.*, machines that stack goods onto a pallet) were running, Lazer Spot and SIX drivers

---

[4] Being "subject to" this requirement means that any driver—including Plaintiffs—could be assigned at Lazer Spot or SIX's discretion to drive on public roads for this purpose.

were required to make approximately 21 trips from the mill to the DC per day.  (*Id*.; Doc. 150-5 at 19, 25).

When the palletized paper products left the mill, they were ready to be transported to KC's customers.  The goods were not modified or re-packaged once they left the mill.  (Doc. 150-2 at 13, 14, 18, 20-22).  KC distributed the paper products manufactured at its mill to customers throughout the country.  A significant portion of the finished paper products were sent to out-of-state customers, including customers in Georgia, Texas, Florida, Ohio, South Carolina, and Illinois.  (Doc. 150-4 at 2, 4; Doc. 150-5 at 21).[5]

These interstate transports were triggered by orders from out-of-state customers.  (Doc. 150-2 at 18; Doc. 150-4 at 2, 4; Doc. 150-5 at 17).  KC's corporate representative testified that when the goods left the mill, KC intended and expected that the goods would continue on in an interstate trip to reach the customers who ordered the goods.  (Doc. 150-4 at 4).  In many cases, over-the-road drivers picked up and transported the paper products across state lines the very same day that Lazer Spot or SIX drivers delivered the goods from the mill to the DC.  (Doc. 150-5 at 17).  Even when the goods did not immediately leave the DC after Lazer Spot or SIX drivers delivered them there, over-the-road drivers typically picked them up within eight to twelve hours.  (*Id.* at 18).

To complete the trip from the mill to the DC, drivers exited the mill through a gate, crossed over Bay Bridge Road, drove down Herbert Street, and passed by a guard shack at the end of Herbert Street to enter the DC.  (Doc. 150-4 at 3; Doc. 150-13 at 35-40).

---

[5] Plaintiffs admit that they have no personal knowledge of the final destinations to which the paper products manufactured at the KC mill were headed once they were dropped off at the DC.  (Doc. 150-13 at 25, 26, 53; Doc. 150-7 at 15).

### b.      Raw Fiber Transports from the DC to the Mill

The raw fiber transported from the DC to the mill by Lazer Spot and SIX drivers was also part of an interstate journey, albeit an inbound (rather than outbound) journey.  The raw fiber [?] was purchased by KC and shipped to its DC from outside of Alabama.  (Doc. 150-2 at 6-9) (KC ordered "pulp from as far away as South America and the Arctic Circle and Canada" and ordered "recovered paper … from all over," including "as far away as Wisconsin"); *see also* Doc. 150-13 at 47 (Defendant Scott testifying that he had no knowledge of the origin point of the raw fiber before it arrived at the DC); (Doc. 150-7 at 25, 26).  The final destination of the raw fiber was the mill, where it was utilized by KC to manufacture paper products.  (Doc. 150-2 at 6-11; *see also* Doc. 150-13 at 44).  The raw fiber came to rest briefly at the DC before Lazer Spot and SIX drivers picked it up and moved it to the mill.  (Doc. 150-6 at 4).

To retrieve and deliver the raw fiber, Lazer Spot and SIX drivers exited the mill onto Paper Mill Road through a non-gated entrance referred to as the "construction entrance," turned left onto Paper Mill Road, turned left on Bay Bridge Road, turned right onto Herbert Street, and drove down Herbert Street to enter the DC (and *vice versa*).  (Doc. 150-2 at 12; Doc. 150-4 at 3; Doc. 150-13 at 26-32, 43-47; Doc. 150-15; Doc. 150-16; Doc. 150-17).

### c.      Transports of Convermat to Merchants Transfer

KC also produced finished "Convermat" rolls, which were transferred by Lazer Spot and SIX drivers to Merchants and then shipped out of state to KC's customer, Convermat.  (Doc. 150-4 at 5).[6]  KC required Lazer Spot and SIX drivers to be available to transport Convermat loads at

---

[6] Convermat, which is headquartered in New York, describes itself as "the leading global supplier of parent rolls of tissue to more than 80 countries worldwide." *See* http://Convermat.com/.

least 15 days per month.  (Doc. 150-2 at 19, 20-22; Doc. 150-5 at 8, 12; Doc. 152-10 at 26, 27).

Convermat is a paper distributor who purchases the rolls from KC and delivers them to customers

around the country.  (Doc. 152-12 at 4, 5).  The finished paper rolls are temporarily stored at

Merchants an average of 10 days.  No further production or changes occur to the rolls while at

Merchants.  (*Id*. at 7, 20, 21, 26, 27; Doc. 152-11 at 5; Doc. 152-12 at 8, 18, 19).

Merchants is located at 1200 Paper Mill Road, approximately one mile from KC.  (Doc.

152-12 at 3, 34).  It is undisputed that Paper Mill Road is a public road, and that at least two of

the remaining Plaintiffs drove loads of Convermat to Merchants.[7]

To deliver a Convermat load, Lazer Spot and SIX drivers exited the mill through the

construction entrance, turned right onto Paper Mill Road, and traveled approximately 1.5 miles

on Paper Mill Road to reach the warehouse.  (Doc. 150-5 at 25, 26; Doc. 150-6 at 4; Doc. 150-13

at 51-53).

### 2.  Plaintiff Mosley's Employment with Lazer Spot and SIX

Lazer Spot hired Plaintiff Cleotho Mosley on April 16, 2014, and he worked for the

Company as a driver until April 1, 2015.  (Doc. 150-7 at 3, 4, 27).  Mosley worked at both the mill

and the DC.  (*Id*. at 21).  Two of Mosley's co-workers, including his co-Plaintiffs testified that they

witnessed him transporting goods on public roads during his employment with Lazer Spot.  Scott

testified that he saw Mosley drive across Bay Bridge Road and down Herbert Street to take

trailers of palletized finished paper products from the mill to the DC.  (Doc. 150-13 at 57, 58).

Byron Nettles, another former Lazer Spot employee who regularly worked alongside Mosley,

---

[7] Former Plaintiffs Soloman Curry, Taurus Thompson, Bernard Woulard, Semaj Britford, and Jawarren Hector also drove Convermat loads to Merchants.  (Doc. 151 at 25.)

witnessed Mosley (i) transporting finished paper products from the mill to the DC, (ii) transporting Convermat loads from the mill to Merchants, and (iii) transporting loads of raw fiber from the DC to the mill.  (Doc. 150-12 at 6-10).

Consistent with these witness accounts, Plaintiff Mosley testified in his verified answers to Lazer Spot's interrogatories that he drove Lazer Spot vehicles to various locations.  (Doc. 26 at 4).  During his deposition, Mosley contradicted his own verified answers, which he admitted he signed but said he did not review, by asserting that he did not transport goods on these public roads.  (Doc. 150-7 at 16).  He conceded that, as a Lazer Spot driver, he was required to be willing and able to transport goods on public roads.  (*Id*. at 24-25; Doc. 152-1).

When SIX took over the KC contract from Lazer Spot in 2015, Mosley applied for a driver position and was hired by SIX and assigned to KC.  (Doc. 152-2 at 3, 7, 8).  Mosley became a lead driver for SIX during the last week of April 2017.  (Doc. 152-17 at 2).  As a driver and a lead driver, Mosley transported finished tissue paper from the mill to the DC.  (Doc. 152-2 at 16-18, 25, 26; Doc. 152-18).  He also transported Convermat loads to Merchants.  (Doc. 152-2 at 5, 6, 15, 16, 24, 25, 29-36 (confirming at least one Convermat trip per month between September 2016 - August 2017); Doc. 152-18).  Mosley performed both tasks on a regular basis.  (*Id.*).  Mosley's driving activities for SIX are confirmed by witness accounts, move sheets, and GPS data.[8]  (*See generally* Doc. 151 at 15-18).  And Mosley, like the other drivers, was subject to being called upon to drive on public roads to transport KC's finished products.  (Doc. 152-1 at 4).

---

[8] SIX drivers maintain what are called "move sheets" or "load sheets" which document the trailers they have moved and where they have moved them. (Doc. 152-2 at 21, 22; Doc. 152-3 at 33-37; Doc. 152-4 at 14; Doc. 152-7 at 27-31; Doc. 152-8 at 29-30; Doc. 152-9 at 14, 15, 26).

### 3.      Plaintiff Scott's Employment with Lazer Spot and SIX

Lazer Spot hired Scott as a driver in September 2014.  He continued to work for Lazer Spot until April 1, 2015.  (Doc. 150-13 at 9, 10, 55).  Scott testified that, during his employment with Lazer Spot, he spent approximately 40% of his time driving from the mill to the DC to deliver trailers loaded with pallets of finished paper products that were bound for out-of-state destinations; this work was, in Scott's words, "an everyday job."  (*Id.* at 42, 43, 59).[9]  During his employment with Lazer Spot, Scott also transported inbound loads of raw fiber from the DC to the mill.  (*Id*. at 43-47).

SIX hired Scott on April 1, 2015 to perform the same job duties that he performed for Lazer Spot.  (Doc. 152-8 at 18, 19).  Scott resigned on July 24, 2016 to take a position at KC.  (*Id.* at 19, 25).  As a SIX driver, Scott worked the night shift (*id*. at 28), and he transported finished tissue paper from the mill to the DC on a daily basis.  (*Id.* at 7-11, 14, 15, 27).

Scott denies that he transported Convermat loads during the time period relevant to his claims against Lazer Spot and SIX.  (*Id.* 30).

---

[9] Scott testified that he was unaware of a single Lazer Spot driver who did not move goods over three main roads near the KC facilities (*i.e.*, Bay Bridge Road, Paper Mill Road, and Herbert Street).  (Doc. 150-13 at 60).  Scott's description of his job duties as a driver for Lazer Spot, and his inability to remember any driver who evaded driving over the public roads surrounding the KC facilities, is consistent with the accounts of other witnesses who worked for Lazer Spot.  For example, Nettles, a former Lazer Spot driver, described making the same trips when he worked as a driver for Lazer Spot, and he noted that his fellow Lazer Spot drivers were trained on all three types of routes (*i.e.*, transporting finished paper goods from the mill to the DC, transporting Convermat loads to Merchants, and transporting raw fiber from the DC to the mill).  (Doc. 150-12 at 3-5, 6-10).  Likewise, SIX is required under the contract with KC to provide drivers who are trained and capable of delivering service to any location, and in fact the drivers are trained to do every job at the KC sites and local warehouses; they are aware they may be required to perform any of the driving services required by the KC contract. (Doc. 154 (filed under seal) (SIX 3346)); Doc. 152-4 at 19; Doc. 152-9 at 24, 25; Doc. 152-10 at 28; Doc. 152-11 at 5).

### 4.    Plaintiff Gibson's Employment with SIX

SIX first employed Oscar Gibson as a Class A driver from March 2, 2016 until September 23, 2016 when he quit.  (Doc. 152-3 at 7, 8; Doc. 152-7 at 3).  He was rehired in April 2017 and worked at SIX until October 4, 2017.  (Doc. 152-1 at 5; Doc. 152-7 at 8, 9).

Gibson was assigned to KC for his entire employment.  (*Id*. at 4).  Gibson transported tissue paper loads from the mill to the DC, as often as five to six loads a day. (Doc. 152-7 at 22-24).  Gibson worked the day shift in 2016 and the night shift in 2017, and admits that he transported Convermat loads when he worked the day shift.  (Doc. 152-7 at 13).  While Gibson denied transporting loads to Merchants at night in 2017 at certain times in his deposition (*id.* at 25, 43, 44), he contradicted himself during his deposition, and the move sheets that he created as well as GPS data confirm that he transported Convermat loads in 2017.  (*See generally*, Doc. 151 at 21-24).

## II.    ANALYSIS

### A.    Legal Standard for Summary Judgment

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "The non-moving party 'may not rest on the mere allegations or denials of the [non-moving] party's pleading, but … must set forth specific facts showing that there is a genuine issue for trial.'"  *Mallini v. Ala. Dep't of Indus. Rels.*, No. 10-0130-CG-C, 2011 WL 1897646, at *3 (S.D. Ala. May 18, 2011) (quoting Fed. R. Civ. P. 56(e)).  "The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude

entry of summary judgment." *Beard v. Langham*, 649 F. Supp. 2d 1332, 1336 (S.D. Ala. 2009). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It is "material" if it might affect the outcome of the case under the governing law. *Anderson*, 477 U.S. at 248.

"[T]he question of whether [an] employee's particular activities exclude [him] from the overtime benefits of the FLSA is a question of law," which may be determined on summary judgment. *Langley v. Gymboree Ops., Inc.*, 530 F. Supp. 2d 1297, 1301 (S.D. Fla. 2008) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)). Pursuant to the Supreme Court's ruling in the 2018 case *Encino Motorcars, LLC v. Navarro*, courts analyzing the application of an exemption to the FLSA should apply a "fair reading" to the exemption. 138 S. Ct. 1134, 1142 (2018) (internal citations omitted); *see also Holt v. City of Battle Creek*, 925 F.3d 905, 909-10 (6th Cir. 2019); *Ramirez v. Statewide Harvesting & Hauling, LLC*, No. 8:17-cv-1753-T-35AEP, 2019 WL 3383622, at *3 (M.D. Fla. May 24, 2019) (applying the "fair reading" standard to the agricultural and motor carrier exemptions).

Here, the undisputed record evidence leaves no genuine dispute as to Plaintiffs' proper classification as exempt employees pursuant to the Motor Carrier Exemption under either the narrow construction or the fair reading standard.

### B.  Plaintiffs were Exempt from the FLSA's Overtime Requirements Pursuant to the Motor Carrier Act Exemption

Employment does not guarantee the payment of a premium wage for overtime under the FLSA. Rather, Congress has exempted various categories of employees from the FLSA overtime

requirements, including those subject to the Motor Carrier Act exemption ("MCE"):

> The provisions of [FLSA] section 207 of this title shall not apply with respect to—(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49.

29 U.S.C. § 213(b)(1).  The Eleventh Circuit has held that the MCE applies to an employee who is:

> (1) employed by an employer subject to the jurisdiction of the Secretary of Transportation; and (2) engaged in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of property in interstate commerce within the meaning of the Motor Carrier Act.

*Mena v. McArthur Dairy*, 352 F. App'x 303, 305-06 (11th Cir. 2009) (*per curiam*); *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 182 (11th Cir. 1991) (per curiam) (quoting 29 C.F.R. § 782.2(a)).

### 1.    Defendants are Motor Carriers Subject to the DOT's Jurisdiction

The Plaintiffs do not dispute that Lazer Spot and SIX are motor carriers subject to the DOT's jurisdiction.  Under the MCA, the Secretary has jurisdiction over "motor carriers" and "motor private carriers."  49 U.S.C. § 31502(b).  A "motor carrier" is "a person providing motor vehicle transportation for compensation."  *See Id.* at § 13102(14).  A "motor vehicle" is a "vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation, or a combination determined by the Secretary [of Transportation]."  *Id.* at § 13102(16).  A "highway" means "a road, highway, street, and way in a State."  *Id.* at § 13102(9).

Lazer Spot and SIX are "motor carriers" within the meaning of the MCA.  First, Lazer Spot and SIX are each licensed with the DOT and have FMCSA authorization necessary to act as interstate carriers, which establishes that the DOT has jurisdiction over each Company.  *See Baez*, 938 F.2d at 182 ("[T]he permit issued by the [DOT] indicates that jurisdiction has already been exercised.  Thus, it is clear that [defendant] is a motor carrier subject to the Secretary's jurisdiction.") (internal citation omitted); *Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1227 (11th Cir. 2009) (*per curiam*) ("[T]he fact that a company holds these kind of authorizations indicates that the DOT has exercised jurisdiction over it.").  Second, each Company received compensation from clients to transport goods on public highways. (Doc. 150-21 at 2; Doc. 152-1 at 2, 3).  Third, as detailed below, the transportation that they engaged in was interstate in nature because the goods were shipped to out-of-state destinations or inbound from origin points outside the state.  Accordingly, the MCE's first requirement is satisfied in this case.

> **2.      Plaintiffs Engaged in Activities of a Character Directly Affecting the Safe Operation of Motor Vehicles in the Transportation of Goods in Interstate Commerce on Public Highways**

To satisfy the second prong of the MCE, the Plaintiffs must have engaged in activities affecting the safe operation of motor vehicles while transporting passengers or property in interstate commerce.  *Nolasco v. AKS Cartage Corp.*, 2018 WL 2322599, at *10 (S.D. Fla. May 22, 2018); *Pritchett v. Werner Enters., Inc.*, 2013 WL 4524337, at *2 (S.D. Ala. Aug. 27, 2013).

### a.      Plaintiffs Worked as Drivers

Courts have routinely held that, as a matter of law, employees who drive motor vehicles affect the safety of operation of motor vehicles as required to satisfy the second prong of the MCE.  *See, e.g.*, *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 685 (1947); *Morris v. McComb*, 332 U.S. 422, 436-38 (1947).  While the MCE applies to numerous types of jobs, the exemption is most obviously applicable to the actual drivers of motor vehicles.  *See* 29 C.F.R. § 782.3 (defining "driver" as "an individual who drives a motor vehicle in transportation which is, within the meaning of the Motor Carrier Act, in interstate or foreign commerce").

Plaintiffs characterize themselves as "spotters" and argue that, as "spotters," they could not have qualified for the MCE because the DOL has excepted spotters from its coverage.  (Doc. 164 at 13, 14 (citing 29 C.F.R. § 782.3(b))).  However, there is no dispute of material fact as to the drivers' job duties, which include transporting finished KC products over public roads.  *See* Doc. 164-1 (providing testimony from Mosley that his "duties were to move … trailers … from the paper mill … to the Distribution Center . . . or *vice versa*), Doc. 164-2 (same testimony from Scott); Doc. 150 at 5-12; Doc. 152-7 at 16, 17, 22-24 ("probably do five loads a day. Sometimes six…"); Doc. 152-8 at 7-15 ("That's an everyday job. We do that every day.").[10]

---

[10] The parties do not dispute that Lazer Spot and SIX provided both "spotting" (moving loaded and empty trailers between different points in the client's facility) and "shuttling" (transporting loaded or empty trailers over public roads) services at the KC facilities. (Doc. 150-21 at 2; Doc. 152-1 at 3).  Plaintiffs cite section 24d01 of the DOL Field Operations Handbook in support of their argument that the Court should defer to the Agency's position that spotting on private property, combined with nothing more than crossing a public road, would not qualify a worker for the MCE. (Doc. 164 at 17, 18).  Section 24d01 does not include any statutory or regulatory reference and is issued by the DOL as an interpretation of DOT regulations. Given its inconsistency with 49 C.F.R. § 390.5, a DOT regulation, "the Court must turn to the DOT's interpretation of the MCE, rather than any interpretation by the DOL."  *Roberts v. Cowan Dist. Servs., LLC*, 58 F. Supp. 3d 593, 607 (E.D. Va. 2014).  The language on which Plaintiffs rely, however, has no application to this case because the drivers did not merely cross one public road, but drove on several public roads surrounding the KC facilities, and the DOL has stated that "spotters" are exempt where their job includes "[t]he movement of trucks, tractors, or trailers (either empty or loaded) over the public highways between loading

The regulatory language that Plaintiffs cite for the proposition that spotters are non-exempt applies to employees who work solely within a private yard utilizing a vehicle that cannot and does not travel on public roads.  *See, e.g.*, *Verdi v. Domino Logistics Co.*, No. 1:10-CV-1888, 2011 U.S. Dist. LEXIS 65326, at *7 (N.D. Ohio June 16, 2011) (citing 29 C.F.R. § 782.3(b) in support of finding yard "switchers" nonexempt where "Plaintiffs drove . . . hostler tractors that 'were not registered vehicles and did not have working turn signals or flashers'" and "nothing in the record suggests that the Plaintiffs drove 'over the public highways'"); *Billingslea v. S. Freight, Inc.*, 699 F. Supp. 2d 1369, 1377 (N.D. Ga. 2010) (citing 29 C.F.R. § 782.3(b) in support of finding a yard hostler nonexempt where "the only vehicle that Plaintiff drove or was authorized to drive as part of his employment with Defendant was a hostler tractor that he could not, and did not, take on to any public roads or interstate highways").

Unlike the "spotters" described in 29 C.F.R. § 782.3(b), and those held to be non-exempt in *Verdi* and *Billingslea,* Plaintiffs and the other drivers operated vehicles that were registered, insured, and intended for use on public roads, and driven regularly on public roads.  (Doc. 150-5 at 19, 20; Doc. 150-20; Doc. 152-1 at 4; Doc. 152-11 at 5).[11]  Drivers were not limited to work within one facility; the gated mill was separated from the ungated DC (which contained other

---

platforms, the garage, storage facilities or terminals, where such movement is either the beginning or continuation of an interstate or foreign journey." (Doc. 150-24 at § 24b00).

[11] Plaintiffs assert that "Lazer Spot stressed that jockey trucks, which is what spotters principally drove, should not be used in over-the-road transport because of weight restrictions, and they only travel 25 miles per hour."  (Doc. 164 at 27).  In support of this statement, Plaintiffs cite the deposition of Byron Nettles, an Assistant Manager for *SIX* in which Mr. Nettles testified regarding *SIX's spotter trucks*.  (Doc. 164-5 at 22).  Nettles did not provide testimony regarding Lazer Spot's vehicles and did not state that either Company's spotter trucks were restricted from travel on public roads.  To the contrary, he testified that all of SIX's vehicles were registered in a manner that allows them to go on public roads.  (*Id.* at 25, 26).  There is no evidence in the record that Lazer Spot restricted the use of any of its vehicles to private property, and the undisputed evidence demonstrates that Lazer Spot's vehicles were all driven on public roads.  (Doc. 150-5 at 9).

businesses) by Bay Bridge Road, a public road, and according to KC, the mill and the DC are separate facilities.  (Doc. 152-11 at 3,).  Plaintiffs admit that their work involved driving on nearby roads. (Doc. 150-7 at 14, 15, 25, 26; Doc. 150-12 at 6-10; Doc. 150-13 at 57, 58; Doc. 164 at 7, 8; Doc. 150-13 at 42-47, 59; Doc. 164-1).  Thus, they were not confined to a private yard.

Moreover, the FLSA and the applicable agency guidance make clear that a driver performs safety-affecting work, and therefore qualifies for the exemption, if he *could have* been reasonably expected to participate in interstate trips.  *See* 29 U.S.C. § 213(b) (exempting from the FLSA's overtime provisions any employee "with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service"); 29 C.F.R. § 782.2(a)(3) ("As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is (or, in the case of a member of a group of drivers … is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities . . ., he comes within the exemption in all workweeks when he is employed at such job . . . [t]he rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting "safety of operation."); Doc. 150-23 (explaining that the Secretary of Transportation will assert jurisdiction over employees who "could have been called upon to, or actually did, engage in the carrier's interstate activities"); Doc. 150-24 at § 24e01(b) (explaining that drivers who could be reasonably expected to participate in interstate trips would be exempt under § 13(b)(1) "notwithstanding references to the contrary contained in 29 CFR 782.2").

As described herein, Plaintiffs drove their employers' vehicles on public roads, and they

were subject to being called upon to make such trips during the entire period of their employment as drivers for Lazer Spot and SIX.  Accordingly, whether they are called spotters or drivers, Plaintiffs engaged in activities that directly affected the safety of operation of motor vehicles.

  **b.  Plaintiffs were Subject to Being Called Upon to Drive on Public Roads, and Did So, Throughout Their Employment as Drivers**

It is undisputed that Plaintiffs were subject to being called upon to transport goods on the public roads surrounding the KC facilities and that Plaintiffs made such trips at certain points during their respective periods of employment.  Nor is it disputed that other Lazer Spot and SIX drivers regularly transported goods on public roads, including Bay Bridge Road, Herbert Street, and Paper Mill Road.  (Doc. 164 at 7).

Although Scott denied transporting Convermat loads, he confirmed that he regularly transported finished paper goods and raw fiber between the mill and the DC, which required him to drive on Bay Bridge Road, Herbert Street, and Paper Mill Road.  (Doc. 150-13 at 33-47).  Scott testified, "[t]hat's an everyday job. We do that every day."  (Doc. 152-8 at 14, 15).

Mosley stated in sworn answers to Lazer Spot's interrogatories that he drove on Paper Mill Road and Herbert Street.  (Doc. 26 at 4).  Although during his deposition Mosley contradicted his earlier admission, multiple witnesses confirmed Mosley's initial admission, testifying that they personally witnessed Mosley transporting finished goods on the public roads around the KC facilities when he worked as a Lazer Spot driver.  (*See* Doc. 150-13 at 57, 58 (Defendant Scott testifying that he witnessed Mosley drive across Bay Bridge Road and down Herbert Street to take trailers of palletized paper products from the mill to the DC); *see also* Doc. 150-12 at 6-10 (Byron Nettles testifying that he regularly worked shifts alongside Mosley, and he witnessed

Mosley (i) driving palletized loads of finished paper products from the mill to the DC, (ii) driving Convermat loads from the mill to Merchants, and (iii) driving loads of raw fiber from the DC to the mill during the period when they both worked for Lazer Spot as drivers)).  Moreover, Mosley conceded that, as a Lazer Spot driver, he was required to be willing and able to transport goods on public roads.  (Doc. 150-7 at 24, 25; Doc. 150-8).  And while he provided conflicting testimony regarding his driving activities for Lazer Spot, he confirmed in his deposition that he transported finished tissue paper from the mill to the DC on a regular basis throughout his employment with SIX.  (Doc. 152-2 at 16-18, 25, 26; Doc. 152-18.) He also confirmed that he made at least one trip with Convermat to Merchants per month between September 2016 and August 2017.  (Doc. 152-2 at 5, 6, 15, 16, 24, 25, 29-36; Doc. 152-18).

Gibson testified that in 2016 and 2017 he took loads of finished tissue paper from the mill to the DC five or six times a day, and load sheets confirm his frequent trips.  (Doc. 152-7 at 24; Doc. 152-20).  While Gibson contends in his testimony that he did not move Convermat to Merchants when he was on the night shift, SIX presented load sheets and GPS evidence which confirm that Gibson made numerous trips to Merchants, which the Plaintiffs do not dispute. (Doc. 151 at 20-24).

The attempts by Mosley and Gibson to establish that they did not drive on public roads as part of their employment with, respectively, Lazer Spot and SIX are insufficient to create a genuine issue of material fact as to their duties.  A Plaintiff may not avoid summary judgment by disputing his own admissions.  *See, e.g.*, *Calvo v. B&R Supermarket, Inc.*, 63 F. Supp. 3d 1369, 1372 (S.D. Fla. 2014) (Bloom, J.) (disregarding Plaintiff's declaration where it "consist[ed] in large part of self-serving statement and opinions otherwise unsubstantiated by the record before the

20

[court]"). Mosley's testimony about his duties during his employment with Lazer Spot is directly contradicted by his prior admission as well as the testimony of other witnesses who witnessed Mosley transporting goods on public roads during his employment as a Lazer Spot driver. His denial is therefore insufficient to create a genuine issue of material fact. *See Riley v. City of Montgomery*, 104 F.3d 1247, 1251 (11th Cir. 1997) (affirming summary judgment for defendant where Plaintiff's version of events was "inherently incredible and could not support reasonable inferences sufficient to create an issue of fact"). Similarly, Gibson's testimony denying that he moved Convermat to Merchants at night is "completely unsupported by any other record evidence [and] insufficient to resist summary judgment." *Castillo*, 2017 WL 945188, at *6 (S.D. Fla. Feb. 10, 2017) (citation omitted). Moreover, his testimony is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Sparman v. Blount Cty. Bd. of Educ.*, 2016 WL 5110484, at *3 (N.D. Ala. Sept. 19, 2016).

Assuming *arguendo* Plaintiffs did not make trips on public roads in interstate commerce, or did not make such trips during particular periods of their employment, they would still be subject to the MCE because there is no dispute that they were subject to being called upon to transport goods over the public roads around the KC facilities throughout their employment. (Doc. 150-7 at 24, 25; Doc. 150-8; Doc. 152-1 at 4). The MCE squarely applies where, as here, a driver "could have been called upon to, or actually did, engage in the carrier's interstate activities." Doc. 150-23; *see also* Doc. 150-24 at § 24e01(b) ("Where a driver … has not made an

actual interstate trip … they may still be subject to DOT's jurisdiction, if: … the driver … could have, in the regular course of his/her employment, been reasonably expected to make one of the carrier's interstate runs[.]"); *Vidinliev v. Carey Int'l, Inc.*, 2009 WL 2848344, at *2 (N.D. Ga. 2009) (granting summary judgment to employer and finding that drivers were exempt because "[e]ven though many of the Plaintiffs did not make … interstate trips, any of them could have reasonably been expected to do so").  There is no dispute that Lazer Spot and SIX drivers were required to be prepared to transport goods over public roads as a condition of their employment, and that they were subject to being called upon to do so during the *entire* period of their employment with Defendants.  Thus, even if, *arguendo* Plaintiffs did not drive over public roads for some portion of their employment, they still satisfied the MCE's requirements.[12]

In light of these undisputed facts, it is clear that the Plaintiffs and other drivers drove on public roads.  A "public road" is defined as one that is (i) under the jurisdiction of a public agency and open to public travel, *or* (ii) on private property that is *open to public travel*.  *See* 49 C.F.R. § 390.5.  "'Open to public travel' means that the road section is available, except during scheduled periods, extreme weather or emergency conditions, passable by four-wheel standard passenger cars, and open to the general public for use without restrictive gates, prohibitive signs, or regulation other than restrictions based on size, weight, or class of registration."  *Id.*[13]; *see also*

---

[12] Notably, Plaintiffs do not dispute other drivers took loads of tissue paper to the DC and loads of Convermat to Merchants. (Doc. 151 at 25).  This undisputed fact highlights the reality that Plaintiffs were part of a group of drivers that routinely made trips on public roads and were subject to being called upon to do so at any time.

[13] This language comes from Part 390 of the Federal Motor Carrier Safety Regulations, which governs motor carriers and sets forth driver qualification standards.  In their Response, Plaintiffs cite an inapplicable code section governing the Federal Highway Administration, which "prescribe[s] requirements for the development, implementation, and evaluation of a highway safety improvement program (HSIP) in each State."  23 C.F.R. § 924.1.  (*See* Doc. 164 at 19 (citing 23 C.F.R. § 924.3 for the proposition that "[p]ublic road means any highway, road, or street under the jurisdiction of and maintained by a public authority and open to public travel, including non-State-owned public

*Buscarino v. TQ Logistics, Inc.*, No. 0:08-3882, 2010 U.S. Dist. LEXIS 82145, at *24 (D.S.C. Aug. 11, 2010) (granting summary judgment to drivers who claimed they were misclassified *only* for the portion of their employment, following a land acquisition, that their work took place on "property behind secured gates and not on thoroughfares open to and accessible by the public").

Here, the roads at issue—Bay Bridge Road, Herbert Street, and Paper Mill Road—were all open to the public.  (Doc. 150-4 at 3; Doc. 150-5 at 6; Doc. 150-7 at 30; Doc. 150-13 at 40, 41; Doc. 150-19 at 3-5).  The roads were traveled by passenger vehicles and pedestrians.  (Doc. 150-7 at 30; Doc. 150-13 at 40, 41; Doc. 150-19 at 3-5).  Numerous other businesses were located off of the three roads, and those businesses' employees utilized the roads.  (Doc. 150-2 at 17, 18; Doc. 150-13 at 52, 53; Doc. 150-19 at 4).  In addition, the City of Mobile responded to public safety issues such as car accidents and performed maintenance work on Herbert Street on several occasions, and it prohibited KC from enlarging the guard shack at the end of the street on the basis that it would encroach on the public right of way.  (Doc. 150-5 at 7, 22-24; Doc. 150-18 at 2, Ex. 1; Doc. 150-19 at 5).

Even Herbert Street, for which there is a dispute about ownership,[14] is a public road for purposes of § 390.5, because it was open to public travel, utilized by members of the public, and was treated as a public thoroughfare regardless of its ownership.  Plaintiffs and several other witnesses described seeing personal passenger vehicles and even pedestrians on Herbert Street.  (Doc. 150-7 at 30; Doc. 150-13 at 40, 41; Doc. 150-19 at 3-6).   There are numerous other businesses and residences located in the vicinity (Doc. 150-6 at 4; Doc. 150-13 at 52, 53), and a

---

roads and roads on tribal land")).  This Court is not aware of any case, nor have Plaintiffs cited any case, in which a court has cited this regulation in the context of applying the MCE.

[14] Plaintiffs contend that Herbert Street is privately owned by an entity called Chippewa Lakes, LLC. (Doc. 164 at 7).

number of third-party businesses have operated *in the DC* alongside KC with those businesses'
employees using Herbert Street to get to work (Doc. 150-2 at 17, 18; Doc. 150-19 at 4).   Moreover,
there is no evidence that any entity, including Chippewa Lakes, ever restricted public access to
Herbert Street.   To the contrary, the Site Security Manager for the Company that mans the KC
entrance points testified that Herbert Street is open to the public, that there are no gates,
barricades, or signs restricting public access, and that officers can log vehicles passing the guard
shack at the entrance to the DC but cannot restrict their use of any portion of Herbert Street.
(Doc. 150-19 at 3, 4).   Taxis, Lyft drivers, food delivery drivers, and public utility vehicles all used
Herbert Street and entered the DC without any special authorization.   (*Id.*).   Plaintiffs confirmed
the absence of gates or barriers restricting access to Herbert Street.   (Doc. 150-7 at 29, 30; Doc.
150-13 at 37-40).

Based on these facts, this Court finds that each of the three roads at issue are and were
public within the meaning of 49 C.F.R. § 390.5.   Accordingly, Plaintiffs' work transporting goods
over Herbert Street and the other roads constituted transportation on "public highways" within
the meaning of the MCE.

### c.      Plaintiffs Transported Goods in Interstate Commerce

The parties do not dispute that Plaintiffs did not cross state lines while driving Lazer Spot
or SIX vehicles. Thus, the Court must determine whether their intrastate driving trips satisfy the
MCE.

It is well settled that trips within a single state are considered to be interstate in nature
for purposes of the MCE when those trips are part of a practical continuity of movement across
state lines from the point of origin to the point of destination.   *Mena v. McArthur Dairy, LLC*, No.

08-22585-CIV-UNGARO, 2009 WL 10666944 at *6 (S.D. Fla. May 12, 2009) (holding that Plaintiff's transportation of goods within a single state formed part of a "practical continuity of movement" across state lines where the products that Plaintiff delivered within the state were bound, at the time they were delivered, for a destination outside of the state).  Indeed, while "[h]ighway transportation by motor vehicle from one State to another, in the course of which the vehicles cross the State line, clearly constitutes interstate commerce . . . [t]he result is no different where the vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce within the meaning of [the FLSA and the MCA]; the fact that other carriers transport it out of or into the State is not material." 29 C.F.R. § 782.7(b)(1); *see also* Doc. 150-24 at § 24b00 ("The movement of trucks, tractors, or trailers . . . over the public highways between loading platforms, the garage, storage facilities or terminals, where such movement is either the beginning or continuation of an interstate or foreign journey, is itself transportation in interstate or foreign commerce subject to the jurisdiction of the DOT.").

Drawing upon this well-settled law, courts in this Circuit have routinely applied the MCE to drivers who complete one purely intrastate portion of a shipment in interstate commerce, as Plaintiffs and other drivers did for Lazer Spot and SIX.  *See Mena*, 2009 WL 10666944 (affirming that MCE applied to intrastate delivery drivers where much of the property they transported was either bound for out-of-state destinations or had been manufactured in other states and delivered to the employer's warehouse where it was picked up by Plaintiffs based on both standing orders and customers' projected needs); *Baez*, 938 F.2d at 182 (holding that intrastate drivers who never crossed state lines were exempt under the MCE where the checks and other

instruments they transported were bound for banks outside the state); *Likes v. DHL Express (USA), Inc.*, No. 2:08-cv-00428-AKK, 2012 U.S. Dist. LEXIS 188599, at *45 (N.D. Ala. Mar. 7, 2012) ("Plaintiffs never crossed state lines. Nonetheless, because they transported packages that moved in interstate commerce, the interstate requirement is satisfied."); *Williams v. Kenco Logistic Servs.*, 2010 WL 2670852 (M.D. Fla. 2010) (holding that a delivery driver for a company providing distribution service for Whirlpool was exempt pursuant to MCE where he transported Whirlpool goods manufactured out of the state from a Florida distribution center to customers in Florida).[15]

Like the drivers in *Baez, Likes*, *Mena*, and *Williams*, the Lazer Spot and SIX drivers completed one leg of a larger interstate shipment of finished paper goods.  The interstate shipment was triggered when a buyer such as Convermat, Wal-Mart, or Target ordered paper goods manufactured and distributed by KC.  (Doc. 150-2 at 18; Doc. 150-4 at 2, 4; Doc. 150-5 at 17).  In order to fill the orders, KC utilized Lazer Spot and SIX drivers, including Plaintiffs, to bring finished paper goods from the mill to the DC (or to the warehouse), where the goods continued to their final destinations.  At the time the drivers drove the goods away from the mill, the goods were bound for destinations throughout the United States, including Georgia, Texas, Florida,

---

[15] In addition, a district court recently granted summary judgment to Lazer Spot in a case containing virtually identical claims. *See Featherston v. Lazer Spot, Inc.*, No. 2:17-cv-01221-APG-GWF, 2018 U.S. Dist. LEXIS 145003 (D. Nev. Aug. 27, 2018).  In *Featherston*, a former Lazer Spot driver filed a misclassification claim, arguing, like Plaintiffs, that his duties did not bring him within the scope of the MCE. *Id.* at *1.  Featherston worked at a facility similar to KC where Lazer Spot's client manufactured goods that were shipped to numerous out-of-state destinations. *Id.* at *1-2.  As here, it was undisputed that Featherston never crossed state lines, that he drove a short distance over public roads, and that he did not drive on public roads every day or even every week.  *Id.* at *2; *see also* Doc. 150-22 at 12, 13. Against this factual backdrop, the district court ruled that Featherston completed one leg of a larger interstate shipment, and his "role in interstate shipments qualifie[d] as transportation in interstate commerce under the MCA." 2018 U.S. Dist. LEXIS 145003 at *8.  Accordingly, the court granted summary judgment to Lazer Spot. *Id.* at *10. Although *Featherson* is not binding precedent, this Court finds the reasoning persuasive in light of the substantial similarities between the job duties performed by *Featherston* and Plaintiffs.

Ohio, South Carolina, and Illinois. (Doc. 150-4 at 2, 4; Doc. 150-5 at 21). A significant portion of the goods traveled to out-of-state customers. (Doc. 150-4 at 4). As KC's corporate representative explained, "[i]f you [we]re in the southern part of the United States, the Southwest, the Southeast, the Midwest, and portions of the Rust Belt, the high probability if you get a Scott 1000 package is it was made [at the KC mill] in Mobile." (Doc. 150-2 at 15, 16). In addition, Plaintiffs were subject to being called upon to complete (and did, in fact, complete) the last leg of the interstate shipment of the raw fiber used to make the paper products. (*Id.* at 6-11; *see also* Doc. 150-13 at 44).

Plaintiffs argue that they did not transport goods in interstate commerce because the goods they transported "were unloaded at the Distribution Center." (Doc. 164 at 15). The Supreme Court has made clear, however, that "[a] temporary pause [in a warehouse] does not mean that [goods] are no longer 'in commerce' within the meaning of the [motor carrier act]." *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943). As noted above, the paper goods that Plaintiffs transported to the DC were typically transported out of state within eight to twelve hours, if not immediately, and the raw fiber rested at the DC for short periods of time. (Doc. 150-4 at 4; Doc. 150-5 at 17; Doc. 150-6 at 4). Plaintiffs cannot dispute these facts; they admit that they have no knowledge of the length of time the goods were at the DC. (Doc. 150-13 at 25, 26, 53; Doc. 150-7 at 15). Thus, the goods remained in the continuous flow of interstate commerce.[16]

---

[16] The fact that KC intended to ship the goods to out-of-state destinations at the time Plaintiffs transported them, and the fact that KC did not modify the goods or store them for long periods of time after Plaintiffs completed the first leg of the interstate shipment of the goods distinguishes this case from prior decisions in which this court found that drivers did not qualify for the MCE. *See Smith v. Werner Enters.*, No. 14-0107-WS-B, 2015 U.S. Dist. LEXIS 93859, at *8 (S.D. Ala. July 20, 2015) (Steele, J.) (holding that drivers were nonexempt where the defendant failed to provide evidence of the shipper's intent that the goods be shipped to out-of-state destinations at the time they were transported by the drivers); *Pritchett v. Werner Enters.*, No. 12-0182-WS-C, 2013 U.S. Dist. LEXIS 181523, at *16 (S.D. Ala. Dec. 31, 2013) (Steele, J.) (holding that drivers were nonexempt because the "jumbo rolls" of paper transported

In sum, the undisputed evidence establishes that Plaintiffs drove commercial vehicles on public roads, moving finished goods bound for (or arriving from) out-of-state locations. Thus, Plaintiffs engaged in activities that directly affected the safety of operation of motor vehicles in the transportation on the public highways of property in interstate commerce within the meaning of the MCE.

### d. Plaintiffs Engaged in Interstate Commerce Activities with Sufficient Frequency to Qualify for the MCE

Plaintiffs argue that Court must engage in a week by week analysis of the work activities actually performed by them in order to determine which, if any, weeks the MCE should apply. Such an analysis has been rejected by the DOT, DOL, and many courts throughout the country. Instead, the DOL and a majority of Courts have adopted the DOT's four-month rule,[17] which provides that that "[e]vidence of driving in interstate commerce or being subject to being used in interstate commerce should be accepted as proof that the driver is subject to [DOT jurisdiction] for a 4-month period from the date of the proof." DOT, Fed. Hwy. Admin., 46 Fed. Reg. 37902, 37903 (July 23, 1981); *see also* Doc. 150-24 at § 24e01(d); *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 n.2 (7th Cir. 2011); *Molina v. First line Sols. LLC*, 566 F. Supp. 2d 770, 782-83 (N.D. Ill. 2007); *Ballou v. DET Distrib. Co.*, 2006 U.S. Dist. LEXIS 48514 at *41 (M.D. Tenn. July 17, 2006); *Songer v. Dillon Res., Inc.*, 2009 WL 1759553, at *5 (N.D. Tex. 2009), *aff'd*, 618 F.3d 467 (5th Cir.

---

by the drivers were subsequently "transformed into individual sheets of copy paper" before the paper was shipped out of state). Those cases are further distinguishable because the court made clear that it would construe the MCE narrowly against the employer, a standard which has been rejected by the Supreme Court. *Compare Smith*, 2015 U.S. Dist. LEXIS 93859 at *5 (noting that the court would "construe FLSA exemptions narrowly against the employer") *and Pritchett*, 2013 U.S. Dist. LEXIS 181523 at *6 (same) *with Encino*, 138 S. Ct. at 1142 (there is "no reason to give [the FLSA's exemptions] anything other than a fair (rather than a 'narrow') interpretation").

[17] In adopting the four-month rule, the DOT explained that "the 4-month period is reasonable because it avoids both the too strict week-by-week approach and the situation where a driver could be used or be subject to being used once and remain subject to [the exemption] for an unlimited time." 46 Fed. Reg. 37,902.

2010); *Bannen v. Liebert Corp.*, 2003 U.S. Dist. LEXIS 27939, at *16 (E.D.N.Y. 2003). "Furthermore, actual driving need not necessarily occur in order for the driver to be exempt; the exemption begins the date the driver could have been called upon to, or actually did, engage in the carrier's interstate activities." *Wells v. A.D. Transp. Express, Inc.*, No. 15-CV-11324, 2016 U.S. Dist. LEXIS 75598, at *12 (E.D. Mich. June 10, 2016). Plaintiffs were subject to being called upon to drive on public roads to transport finished paper goods and raw fiber material during the entire period of their employment. (Doc. 150-5 at 11, 16; Doc. 150-6 at 5; Doc. 150-20 at 6; Doc. 152-1 at 4). But the Court need not rely on that fact alone because the record is undisputed that Plaintiffs did not simply await the assignment of driving duties; they routinely transported goods over public roads to complete one leg of a larger interstate journey. (Doc. 150-5 at 11, 16, 19; Doc. 150-12 at 6-10; Doc. 150-13 at 49-53; Doc. 151 at 25; Doc. 162-9 at 2, 3; Doc. 162 at 26, 27; Doc 164 at 8; Doc 164-1; Doc. 164-2). During the time period relevant to Plaintiffs' claims, there was not one month, let alone a four-month period, in which Plaintiffs were not subject to transporting goods on public roads or did not, in fact, transport Convermat or tissue paper in interstate commerce.

Plaintiffs also assert that their trips to Merchants did not affect the safety of motor vehicles in interstate commerce because the trips were *de minimis*. (Doc. 164 at 19-23). As noted above, Plaintiffs were subject to being called upon to make trips to Merchants during the entire period of their employment, and did, in fact, make such trips. (Doc. 150-13 at 49-53; Doc. 150-12 at 6-10 (describing witnesses Mosley's trips to Merchants); Doc. 150-5 at 11, 16-19). This alone would be sufficient to support their exempt status. *See Rodriguez v. R&L Carriers Shared Servs., L.L.C.*, No. 09-23176-CIV, 2010 U.S. Dist. LEXIS 151840, at *9 (S.D. Fla. June 8, 2010) (rejecting a *de minimis* argument in an MCE case, and explaining that "while the Parties may

dispute the actual amount of time spent" on exempt work, "the undisputed facts show that during the course of his employment, [plaintiff] engaged in duties affecting the safety of operations on commercial motor vehicles," which "is enough to trigger the [MCE]" because "'[i]lt is the character of the activities rather than the proportion of either the employee's time or of his activities' that determines eligibility for overtime under the FLSA") (quoting *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 651-52 (1947)).  Moreover, even if Plaintiffs rarely or never completed trips to Merchants, and even if they had established that they were not subject to being called upon to do so, the record is clear that they drove on two other public roads as part of their job duties.  *See supra* Section B.2.b.

The job functions of the Lazer Spot and SIX drivers place them squarely within the scope of the MCE.  They transported finished products in interstate commerce over public roads on a regular basis.  Accordingly, this Court finds that Plaintiffs were properly classified as exempt pursuant to the MCE and were not entitled to overtime under the FLSA.

### C.       The MCE's "Small Vehicle Exception" is Not Applicable

The only remaining question is whether the so-called "small vehicle exception" to the MCE is applicable.  This exception emanates from the DOL's determination that, for the MCE to apply, the vehicle at issue cannot weigh 10,000 pounds or less.  *See, e.g.*, *Santana v. Lykes Exclusive, LP*, 2013 WL 1001850, at *3 (S.D. Fla. 2013) (citing a DOL bulletin and noting that "the [MCE] does not apply to a driver … in any workweek in which their work affects the safe, interstate operation of motor vehicles weighing 10,000 pounds or less").

The undisputed evidence, including sworn testimony and documentary evidence, confirms that the vehicles that Plaintiffs drove weighed in excess of 10,000 pounds.  (Doc. 150-5

at 9, 10, 20; Doc. 150-21 at 5, Ex. 4; Doc. 152-1 at 2).  Accordingly, the small vehicle exception does not apply.

### D.    Plaintiffs Failed to Establish that Lazer Spot or SIX Willfully Violated the FLSA

Defendants have established that the MCE applies to the Plaintiff drivers, and therefore they are entitled to judgment in their favor as a matter of law.  The undersigned further finds that Lazer Spot is entitled to judgment as a matter of law on the additional ground that Plaintiffs have no evidence of a "willful" violation, and therefore their claims against Lazer Spot fall entirely outside of the two-year statute of limitations.  This finding applies to SIX as well, to the extent Plaintiffs seek to make a claim against SIX for damages outside of the two-year statute of limitations.

Under the FLSA, every action for unpaid overtime compensation or liquidated damages must be commenced within two years "after the cause of action accrued" unless the FLSA violation was "willful," in which case the action "may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a).  Plaintiffs filed their Complaint on August 9, 2017. (Doc. 1).  Accordingly, the time period relevant to their claims begins on August 9, 2015 unless they can prove by a preponderance of the evidence that Lazer Spot and SIX willfully violated the FLSA, such that Plaintiffs are entitled to the Act's enhanced three-year period.  *See* 29 U.S.C. § 255.  Notably, Mosley's and Scott's claims against Lazer Spot are entirely barred, absent a showing of willfulness, by the applicable two-year statute of limitation because their employment with Lazer Spot ended in April 2015.

To establish a willful violation of the Act, Plaintiffs must prove that their employer violated the FLSA and that it "knew or showed reckless disregard for the matter of whether its conduct

was prohibited by the statute." *Id.* In this context, reckless disregard means the "failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104. "The standard for willfulness under the FLSA is quite high." *Warner v. Walgreen Co.*, 2015 WL 2341937, at *8 (S.D. Fla. 2015) (granting summary judgment to employer on issue of willfulness in misclassification case). "The Eleventh Circuit is hesitant to find 'willful' behavior . . . even when presented with strong evidence of an employer's violation of the FLSA." *Saxton v. Young*, 479 F. Supp. 2d 1243, 1253 (N.D. Ala. 2007). "Neither negligence, nor even unreasonable conduct, is sufficient to prove willfulness." *Ojeda-Sanchez v. Bland Farms, LLC*, 499 F. App'x 897, 902-04 (11th Cir. 2012) (affirming holding that defendant did not willfully violate FLSA because defendant's "procedures demonstrated not only that it knew what its FLSA obligations were, but that it actively sought to ensure that they were met"). "Similarly, the mere fact that the employer knows the FLSA is 'in the picture' is not dispositive of willfulness, and a mere lack of prudence is insufficient to support a finding of willfulness." *Henderson v. Payless Shoes*, 2006 WL 346467, at *7-8 (S.D. Ga. 2006) (holding that Plaintiff's duties were "at least sufficiently close to fitting within the criteria for the exemption" that defendant could not be found to have demonstrated reckless disregard for its obligations under the FLSA) (internal citations omitted).

The determination of willfulness is a "mixed question[] of fact and law," which must be submitted to a jury only where there is evidence from which "a reasonable jury" could find a willful violation. *Ojeda-Sanchez*, 499 F. App'x at 903; *see also Davila v. Menendez*, 717 F.3d 1179, 1185 (11th Cir. 2013). Courts in this district routinely grant summary judgment in cases with facts materially similar to those in this case. *See, e.g.*, *Sullivan v. PJ United, Inc.*, No. 7:13-cv-01275, 2018 U.S. Dist. LEXIS 143246, at *80 (N.D. Ala. July 19, 2018); *Martin v. Coastal Floor Coverings,*

*Inc.*, No. CV414-030, 2015 U.S. Dist. LEXIS 99780, at *6-12 (S.D. Ga. July 23, 2015); *Saxton v.*

*Young*, 479 F. Supp. 2d 1243, 1253-54 (N.D. Ala. 2007).[18]

There is no evidence in this case from which a fact-finder could reasonably conclude that

Lazer Spot or SIX willfully violated the FLSA.  Lazer Spot has put forth undisputed evidence

demonstrating that the Company routinely confirms whether the MCE applies to its drivers at

each site through its pre-bid and quarterly analyses, and Lazer Spot only classifies drivers as

exempt where its pre-bid analysis confirms that the application of the MCE at the site is legally

proper and where its quarterly analyses continue to confirm that the application of the

exemption is appropriate.  (Doc. 150-20 at 6; Doc. 150-21 at 3).  In fact, Lazer Spot classifies

drivers as non-exempt, overtime-eligible employees at numerous locations where it operates

because it has determined that the drivers' duties at those locations do not satisfy the MCE's

requirements.  (Doc. 150-21 at 3).  During the entire period relevant to Plaintiffs' claims, Lazer

Spot was represented by counsel experienced with the MCE who advised the Company on the

exemption.  (Doc. 150-20).  SIX undertook measures to ensure it was complying the FLSA by

reviewing the Motor Carrier Act exemption provision and Department of Labor guidance.  (Doc.

152-3; Doc. 152-15 at 4).  SIX also spoke with its drivers who previously worked for Lazer Spot

and evaluated Mobile County maps which show the public nature of the roads the drivers

travelled.  (*Id.*; 152-1 at 6, 415-17).  In addition, once certain SIX drivers raised a question about

overtime, SIX's Assistant Site Supervisor called the Department of Labor and was assured by the

---

[18] Both of the cases Plaintiffs cite to support their argument that willfulness is a jury question are distinguishable. (*See* Doc. 164 at 28 (citing *Godard v. Ala. Pilot, Inc.*, 485 F. Supp. 2d 1284 (S.D. Ala. 2007) and *Mahshie v. Infinity Ins. Co.*, No. 12-20148-CIV, 2012 U.S. Dist. LEXIS 163569 (S.D. Fla. Nov. 15, 2012)).  Neither of the cases involved claims that were entirely time-barred by the two-year statute of limitations and could survive only upon a showing of willfulness. Moreover, factual questions remained in both cases as to whether the employers had acted willfully.

DOL that the drivers were exempt.  Moreover, most of SIX's drivers transport intermodal freight and SIX commonly reassigned drivers from the KC site to intermodal work, including former Plaintiffs in this action.

Plaintiffs have not presented evidence sufficient to support a jury finding of willfulness. Instead, they seek to avoid summary judgment on their willfulness claim based on their allegation that "Defendants did not get an opinion regarding spotters at the KC facility from the Department of Labor (DOL) before deciding not [to] pay Plaintiffs overtime, an attorney, nor an expert, rather relying on their own 'pre-bid analysis.'"  (Doc. 164 at 28).[19]  This argument misplaces the applicable burden of proof and misstates the law.  Defendants are not required to show that they sought outside counsel or opinion in order to avoid a finding of willfulness.  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134-35 (1988) ("Plaintiffs' burden to show willfulness is not met simply by pointing out that the [employers] did not obtain legal opinions regarding their FLSA obligation").  Indeed, this Court is not aware of any legal support for the argument that an employer willfully violates the law merely by making a classification decision without seeking an opinion on each such decision from the DOL or an outside attorney.  The absence of an outside legal opinion does not demonstrate a violation of the law, let alone a willful violation.  In fact, the Supreme Court has "clearly disfavored a test for willfulness that turned on the employer's

---

[19] Plaintiffs also appear to argue that Lazer Spot engaged in a willful violation because its owners were "aware of the overtime provisions of the FLSA" and "did not pay Plaintiffs overtime." (Doc. 164 at 28). This assertion is merely a re-statement of Plaintiffs' claim, recast as an indictment of Lazer Spot's actions, despite the fact that Lazer Spot's classification of Plaintiffs has not been held to violate the law. If mere awareness of the Act coupled with an alleged violation—or even a proven violation—were sufficient to demonstrate willfulness, then every claim presented under the Act would automatically qualify as willful. The standard for willfulness is far more stringent than Plaintiffs suggest. "[T]he mere fact that the employer knows the FLSA is 'in the picture' is not dispositive of willfulness, and a mere lack of prudence is insufficient to support a finding of willfulness." *Henderson*, 2006 U.S. Dist. LEXIS 7441, at *26.

request for legal advice before, or during, its violation of the FLSA." *Marrs v. United States*, 135 Fed. Cl. 155, 161 (2017) (quoting *McLaughlin*, 486 U.S.at 134-35); *see also Colella v. City of N.Y.*, 986 F. Supp. 2d 320, 337 (S.D.N.Y. 2013).

Based on the undisputed facts presented by the parties, the Court concludes that Defendants did not violate the FLSA, willfully or otherwise, in classifying Plaintiffs as exempt employees.  Even if Mosley and Scott could establish that they were misclassified, their claims against Lazer Spot would fail because they are time barred by the two-year statute of limitations. Likewise, Plaintiffs would be unable to recover damages from SIX outside of the two-year time period applicable to their claims.

## III.    CONCLUSION

IT IS THEREFORE ORDERED that Lazer Spot, Inc. and Lazer Spot Holdings Corp.'s Motion for Summary Judgment (Doc. 150), and Southern Intermodal Xpress, LLC's Motion for Summary Judgment (Doc. 151) are GRANTED.

**DONE and ORDERED** this 27th day of September, 2019.

/s/ JEFFREY U. BEAVERSTOCK
UNITED STATES DISTRICT JUDGE